**Reuben G. LENSKE, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**Nos. 19539, 20448.**

United States Court of Appeals
Ninth Circuit.

Aug. 28, 1967.

Reuben G. Lenske, in pro. per.

Mitchell Rogovin, Asst. Atty. Gen., Richard M. Roberts, Acting Asst. Atty. Gen., Harry G. Marselli, Joseph M. Howard, Charles J. Alexander, Attys., Tax Division, Dept. of Justice, Washington, D. C., for appellee.

Benjamin Dreyfus, San Francisco, Cal., amicus curiae.

Before CHAMBERS, Circuit Judge, MADDEN, Judge of the United States Court of Claims, and HAMLEY, Circuit Judge.

MADDEN, Judge:

The appellant Lenske will be referred to hereinafter as the defendant. In a trial without a jury in the district court he was convicted on three counts of evasion of federal income tax and on one count of wilfully subscribing to a false

income tax return No. 19539 is his appeal from his conviction. No. 20448 is his appeal from the order of the district court denying his motion for a new trial in the case in which he was convicted, and from the order denying his motion to disqualify the trial judge from sitting, on a remand directed by this court.

The function of a Revenue Agent in the organization of the income tax division of the Bureau of Internal Revenue is to investigate situations in which a taxpayer may not have paid as much income tax as he should have paid. Such an investigation is for the purpose of determining whether there is occasion for the Government to take the steps prescribed by law to assess and collect additional taxes. If it appears that the situation may involve a fraudulent evasion of taxes for which a criminal prosecution should be brought, a Special Agent is assigned to the case, and he is thereafter in charge of the investigation. In May, 1959, a Special Agent was assigned to the defendant's case. He and the Revenue Agent who was already working on the collection aspects of the case devoted their full time for the following two and one-half years to the investigation of the defendant's case.

This case was prosecuted and tried by the "net worth" method. In Holland v. United States, 348 U.S. 121, 129, 75 S.Ct. 127, 132, 99 L.Ed. 150, the Supreme Court said, of that method of trial:

> Appellate courts should review the cases, bearing constantly in mind the difficulties that arise when circumstantial evidence as to guilt is the chief weapon of a method that is itself only an approximation.

We follow that admonition of the Supreme Court.

In many net worth cases the prosecution proves that the defendant was able to purchase property or make expenditures during the tax year in excess of what he would have been able to do upon the income which he showed on his tax return. He got the money somewhere, and the Government proves a likely source from which it may well have come. If it did come from that source it was taxable, but was not shown on the return. Sometimes the defendant claims that it came from a cash hoard which he had held for many years, or from a gift or a loan from a relative. Sometimes the expenditures are made from cash, difficult to trace to and from the taxpayer.

No such trappings are involved in this case. There was no suggestion of a secret hoard. The money that came in to Lenske went into his bank account. His payments were made by check. He furnished his cancelled checks to the Special Agent. The Special Agent and his assistant were, with the defendant's permission, installed in the small library of the defendant's law office for many weeks or months. The Special Agent called upon the defendant for particular files as they were needed, and the defendant directed his employees to find and turn over the desired files. There was no instance, apparently, in which any paper or record relating to the defendant's innumerable transactions was not delivered to the Special Agent. The Special Agent testified, rather petulantly, that on a few occasions there was some delay in getting the defendant to direct his employees to promptly find and deliver requested papers. The defendant did have a law practice and many business affairs to attend to.

The Special Agent and his assistant spent many hours in the defendant's library hand-copying writings from the defendant's files and records. In these days of photostating machines that was a very wasteful process. But instead of frankly asking the defendant if they might, upon giving him a receipt for the writings, take them out and have them photographed, they concealed the writings in their brief cases when they left for lunch or at the end of the day, had them photographed, and sneaked them back into the defendant's files when they returned after lunch or the next morning. The trial judge rejected the Special Agent's half-hearted claim that Lenske

consented to the carrying out of the papers. The judge said, "It is irregular to have taken them from the building without advising Mr. Lenske, and the proof is clear that that is what they did." The judge further said that he wanted the pertinent finding to show that Mr. Lenske did not know that the particular document under discussion was given out. We think the evidence shows that the Special Agent's conduct was not only irregular but was furtive and surreptitious, and far beneath the standard of what one expects from a public official.

This case comes to us on the defendant's appeal from a judgment against him rendered after a second trial. The first trial began in February, 1963, before a judge and jury. After some eight weeks of trial and the hearing of 350 witnesses, the judge, the Honorable John R. Ross, died, and a mistrial was declared. Pursuant to the stipulation of the parties, the judge assigned to re-try the case, sitting without a jury, adopted the record of the proceedings before Judge Ross, but took additional evidence presented by both parties. Since the record made before Judge Ross, consisting of some 40 volumes of reporter's transcript, is a substantial part of the record before us, we make certain observations about the proceedings which produced that important part of the present record.

The evidence related to some 90 properties, numerous business transactions, of which the record does not indicate the number, and "thousands, thousands" of documents. The indictment stated that the defendant had attempted to evade and defeat his income taxes for the years 1955, 1957 and 1958 in designated large amounts, and that for the year 1956 he made a false return. The indictment gave no information as to which of his 90 properties, his numerous transactions, his thousands of documents, would be involved in the trial of the case. He knew that the Government had copies of all of his records and documents, because he had given them to the Government's agents. He knew that they had been

studying them for two and one-half years. But even if he, like them, had had at his disposal all the resources of the United States, its Federal Bureau of Investigation and other investigating agencies, he could not have sought out and interviewed all the potential witnesses to all of his activities, to determine from which direction the attack would come, and then prepare his evidence to meet the attack. It would tax the imagination to conjure up a more frightening and frustrating situation than that in which his government has placed this citizen. The trial judge said to government counsel:

> The Government is the strongest litigant in the world. You have got the F.B.I. and all the government agencies available to you. You represent the strongest client in the world.

Nevertheless, in the first trial, the government counsel staunchly opposed the defendant's motion for a bill of particulars which would have given the defendant some little warning of what he was to be tried for. The court denied the defendant's motion.

Later in the trial, when the defendant sought to obtain copies of papers in the government files which might have been useful to the defense, government counsel said that he had regularly furnished exhibits to the defendant "the night before" they were used, that he resisted giving out things from the government files that the defendant should have no access to, that the defendant had even asked for statements of witnesses who had not testified. It thus seemed outrageous to counsel for "the strongest client in the world" that that client's citizen adversary should have even a moment's notice of what a witness would say to his detriment, or should be armed as government counsel was armed, with the prior statements of the witness, with which to confront him if he departed from them.

In the Special Agent's two and one-half years of investigation, he had interviewed some 500, perhaps as many as 1500, persons. If any of those persons made

statements which would have been helpful to Lenske, the Government's attitude was that Lenske had no right to know that, unless he found it out by his own effort and at his own expense. This attitude and conduct of the Government is in direct contradiction to the teaching of the Holland case, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150. At page 135, 75 S.Ct. at page 135, the Court said, of the Government:

> * * * its failure to investigate leads furnished by the taxpayer might result in serious injustice.

Again at page 136, 75 S.Ct. at page 135, the Court said:

> When the Government fails to show an investigation into the validity of such leads, the trial judge may consider them as true and the Government's case insufficient to go to the jury.

The Supreme Court could not have meant that if the Special Agent who follows up the lead simply makes up his mind that the lead produces nothing of advantage to the prosecution, what his investigation discloses becomes a government secret, inaccessible to the defendant, although what the Special Agent learned by the use of the Government's unlimited machinery of investigation might have been thought significant by a judge or a jury if they had been allowed to learn of it. The Court could not have meant that the Special Agent should be the tribunal empowered to decide criminal tax cases.

Under the Holland teaching, a lead not furnished by the defendant but discovered by the Special Agent in his investigation would have at least equal status with a lead furnished by the defendant. The philosophy of Holland is that the trial of a tax fraud case by the net worth method places a defendant at a disadvantage dangerous to his liberty, and that some departure from the gamesmanship tactics of ordinary trials, even other criminal trials, is necessary to compensate for the disadvantage and make the contest more nearly equal.

The Government investigation and trial of the instant case reflects none of the spirit and philosophy of Holland. The defendant's cross examination of the Special Agent developed pertinent information about the Special Agent's long and dedicated investigation. In answer to a question about a $500 item he said, "No, I overlooked that. I just missed it." He listed a check from an insurance company which said, "In full settlement of wind policy," as a fee, and added it to Lenske's taxable income and net worth. With regard to items which he attributed to Lenske personally but which might have belonged to Lenske's law partnership, which made its own tax return, he said, "I don't know if all of the fees got into that partnership. I had no way of determining that." The law library where the Special Agent worked over Lenske's papers for many weeks was the partnership's library, and the Special Agent was never denied any information sought from the partnership or Lenske.

The defendant presented an expert tax witness, Marx, whom the court regarded as an honest and highly competent tax expert. He, as an employee of the Internal Revenue Service, had had charge of supervising and training fourteen agents. After leaving the Internal Revenue Service he had set up an office and acted as a tax expert and witness for taxpayers and for the Government. In his 17 years in and out of the Government he had worked on more than 500 net worth cases. Although Marx had had for only a short time the materials which the Special Agent had worked over for two and one-half years, one significant mistake became apparent to him within the first half hour of his study of the Special Agent's charts and exhibits. His testimony pointed out error after error in the Special Agent's treatment of transactions large and small. Many of his corrections were adopted by the Government when it revised its charts. But of particular significance is Marx's testimony with regard to the Special Agent's failure to follow leads which would have led to the right answers. Several instances were given by Marx. Many of his answers, obtained by following leads,

were, as we have seen, accepted by the Government without further controversy. Marx spoke particularly about the Special Agent's failure to use the microfilms, which banks make and retain and which identify the bank on which a deposited check is drawn, to determine whether the deposit represented taxable income, or the repayment of a debt, or a deposit for investment, or the payment of an insurance loss, or whatever else it might represent. Marx testified that in seventeen years of tax practice he had not once been unable to so trace a deposit to its source. The Special Agent appears not to have made use of this important, practicable and reliable follow-up method.

It may be asked what harm is done, after all, by disregarding the admonitions of Holland, supra, putting everything into a chart showing increased net worth and having the Special Agent testify that it was prepared under his supervision and is right. There is still opportunity for cross examination and for witnesses for the defense.

What is wrong, in addition to its being contrary to the law laid down by the Supreme Court, is that such a process is outrageously unfair. The Government uses its resources, here for two and one-half years, to build up its case and its charts. It then gets its indictment. The taxpayer still has no notice of wherein he is charged with criminal conduct. At the trial, or shortly before, he begins to learn the enormous amount of detail of the Government's case. If he is financially able, and is lucky, he may acquire a tax expert who, in helping him to cross-examine the Government's Special Agent, and in giving direct testimony for the defense, will largely demolish the Government's case. But, as in the instant case, it may leave a remnant, a vestigium somewhat above the level of *de minimis,* so he may still, as in this case, be headed for the penitentiary.

What has happened to him is that the Government has not assumed the burden of proving, beyond a reasonable doubt, that he is guilty. It has assumed only the burden, with its unlimited resources

and time, of preparing a mass of documentary evidence and charts incomprehensible to a layman, all prepared by the Government itself, and saying to the taxpayer, "Your task is to prove that *all* of what is contained in the charts is false, not merely that it is 96% false, but that it is all false. You do not have the time nor the resources that the Government had, but that is your misfortune."

Another incident of the trial will be commented on because it seems to us to have been particularly offensive. The defendant's counsel, having observed that the prosecuting attorney held paper writings in his hand when he, at the trial, examined witnesses who had testified before the Grand Jury, correctly surmised that the writings were transcripts of the witnesses' testimony before the Grand Jury. Thereupon the defendant's counsel requested a copy of the Special Agent's testimony before the Grand Jury, for use in cross examining the Special Agent, who was, and was to be, the Government's principal witness. Government counsel said that he had not been present when the Special Agent testified before the Grand Jury; that there was no transcript; that none had been made up; that it was his belief that the Special Agent's remarks were not even transcribed, hence it would be a physical impossibility to supply a transcript. The court directed government counsel to check the record. Later government counsel stated that of 16 Grand Jury witnesses whose testimony was transcribed, 12 had testified at the trial; that the testimony of the Special Agent and the Revenue Agent was not transcribed.

Whether government counsel meant that no short-hand notes had been made of the Special Agent's Grand Jury testimony, or that such notes were taken and had not been typed up, it is evident that the Government so arranged matters that there would be available transcripts by which neutral witnesses could be held to their Grand Jury testimony and checked if they varied from it, while as to government partisan witnesses, who presented no danger of their being

swayed from their recitals, there would be no writing which the taxpayer might use for cross examination. It was a clever scheme, but one-sided and unfair, and in complete violation of the teachings of Holland v. United States, supra.

We have made critical comments upon many of the acts of the Government in the investigation and trial of this case. In view of what we say hereinafter, it is not necessary to decide, and we do not decide, whether any one or more of the acts hereinabove adverted to, or all of them in combination, would constitute grounds for reversal of the judgment here under review.

■ As we have seen, the Government presented its case by the net worth method. By that method, the Government in effect sets the taxpayer's return to one side and constructs a new return for him. It thereby assumes the burden of proving, beyond a reasonable doubt, that the items in its reconstructed return, so far as they are necessary to show that a tax, or a larger tax, was owed by the taxpayer, are true. In the instant case, for the four years in question, the court found that the defendant was entitled to deductions, from what was otherwise reconstructed as his income, of $85,641.88 for depreciation. Depreciation was thus a large and important item in the reconstruction, particularly in view of the fact that the amounts of taxes found to be owing were so small as to be almost trifling in comparison with the amounts charged in the Government's indictment. A relatively small variation in the amount of depreciation might have erased any tax liability for one or more or all of the years.

A Mr. Kolberg, the Government's expert appraiser, upon whose testimony the Government's depreciation figures were based, was testifying. The following colloquy took place between the court and government counsel, Mr. Alexander:

The Court: Did you every try a condemnation case?

Mr. Alexander: Yes, your honor.

The Court: It is all speculation.

Mr. Alexander: Yes.

The Court: All he [Kolberg] can do is speculate. You are dealing, as I said, in probabilities—these intangibles.

Mr. Alexander: That is correct.

The testimony of the expert Kolberg makes it plain that he did not believe, beyond a reasonable doubt, that his figures were correct. He testified in detail as to the complicated method by which he valued the buildings on Lenske's properties, computed the ratio between land and building and applied that ratio to the cost of the property. He then made his estimate of the economic life of the building to determine the percentage of depreciation for the taxable year. He then applied that percentage to the figure determined in the second preceding sentence, and the result was the depreciation for the year. If he was aware of prospective zoning or of a trend toward commercial development in the area which would result in the early demolition of the existing building, he would take that into account. If such a prospect was known to the taxpayer but was not known to the Government's expert, it of course received no consideration by him. Kolberg testified that he talked with people in the assessors' offices, real estate brokers, and neighbors in the area of the various properties for additional information as to values.

Of importance is the fact that Kolberg made no pretense that there was some arithmetical number which would be right and any other number, greater or smaller, would be wrong, either with regard to his estimate of the value of the building or of its economic life. As to the economic life, he estimated it in "five year jumps." Lenske had some 90 pieces of property of varying types, ages and conditions. Applying the five year jump to a tenant house that had somewhat more than ten years of life to give it a fifteen year life would reduce the percentage of allowable depreciation by one-third. A five year jump from just over thirty years to thirty-five years would have a

much smaller effect on the percentage of depreciation.

The expert Kolberg, being asked as to whether his determination of the economic life of the defendant's depreciable properties leaned toward the longer side or the shorter side, answered:

No, they don't lean. In other words, as I acknowledged before, I am sure there is leeway, but there is leeway in both directions. I deal in round figures because I think that is the way we generally do things, and when I say 15, it could be 17, it could be 13 and it could possibly be a little bit more or a little bit less than that. But I say that is the point in the middle as I see it.

It will be remembered that the trial judge, in the colloquy hereinbefore quoted, had said of Kolberg's figures for the values of Lenske's buildings and land that they were "all speculation." The determination of how much of a deduction for depreciation Lenske was entitled to was arrived at by multiplying a figure which was "all speculation" by a percentage which, according to Kolberg's testimony quoted above, could vary by several percentage points.

The trial judge was apparently troubled by such a synthetic solution of a vital problem in a criminal case. After stating that Kolberg's approach and judgment impressed the court, and that in his opinion the Government, based on Kolberg's testimony, had given the defendant "a reasonable and liberal allowance for depreciation such that any additional allowance would be unrealistic and excessive," the court said:

Nevertheless, out of an abundance of caution the Court has adopted the position of further inceasing the defendant's allowance for depreciation by reducing the economic life by three years on all properties Kolberg assigned an economic life of five years.

The court assigned no other reason for this action than "abundance of caution." Thus the court, skeptical about the contents of the potpourri, added some reasoning to make it less offensive.

If this were a condemnation suit in which it was necessary to arrive at some figure in order to dispose of the controversy, it would be both proper and necessary to adopt the estimates of some competent, honest and frank appraiser, such as Kolberg apparently was. It would rarely be necessary, we suppose, for the court, merely out of an abundance of caution, on its own motion, to add to or subtract from such figures, admittedly on a completely irrational basis. But this is a criminal case, and a close one. In all conscience, is it right to send a man to the penitentiary on the basis of a figure arrived at by the multiplication of an "all speculation" figure by another figure the proponent of which says is fifteen but says that if someone else said it should be thirteen or seventeen or possibly a little bit more or a little bit less, he, too, would be right?

The judge related how he had personally bought an old building for an investment, and had to assign some economic life to it on his tax return. He would have known that he couldn't write it off in five years, and that 50 years would have been to long a life. He did not remember what life he assigned to it. He said, "So you try to do the best you can. You come up with some life on it, even though it is an old building."

■ We are not aware of any precedent for a conviction of tax fraud by the net worth method in which the question of whether any tax was due was a close question and an important factor in the case was the amount of depreciation which the prosecution might properly assign to the defendant on a large number of miscellaneous properties owned by the defendant. We find it hard to imagine a case in which such a conviction would be defensible. In the instant case the Special Agent testified on cross examination that he had never recommended a criminal prosecution on the basis that items of depreciation were fraud items. But this very case is one in which the crucial question of whether there is any tax due depends importantly on the amount of depreciation allowed. Without any in-

tention to lay down a rule of general application, we hold that, in the particular circumstances of this close criminal case, a judgment of conviction based to an important degree upon so speculative and uncertain a manipulation of figures as was the calculation of depreciation in this case cannot stand.

The appellant's conviction is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

Our disposition of No. 19,539 renders the appeal in No. 20,448 moot. It is dismissed.*

Additional separate opinion of MADDEN, Judge:

As appears in the second paragraph of the opinion of the court, a Special Agent was assigned to the investigation of the defendant's tax case. The Special Agent and the Revenue Agent thereafter devoted their full time for two and one-half years to this assignment.

On June 13, 1961, the Special Agent made his report to his superior, the District Director of Internal Revenue. The report consisted of 37 closely type-written pages, followed by an appendix of 84 pages which listed 468 exhibits, and the names and addresses of 315 witnesses who would be available to testify for the prosecution if criminal proceedings were initiated. The report recommended criminal prosecution. Near the beginning of the report, under the heading, "History of Taxpayer," after stating, among other things, that Lenske had been born in Russia, reared in Minneapolis, had been a resident of Portland, Oregon, since 1925, had lived in the same house since 1936, and had no known criminal record, the report continued:

Representatives of the Federal Bureau of Investigation, Portland, and the Intelligence Division of the Portland Police Department stated that they have reason to believe that Mr. Lenske is a communist. In fact, they each maintain an extensive file on Mr. Lenske.

The report then stated that attached to the report were Exhibit 3A, a newspaper clipping stating that Lenske and another lawyer had called a meeting for the purpose of forming a local chapter of the Lawyers' Guild, and Exhibit 3B, which indicated "Mr. Lenske's thinking on the subject of Cuba, Laos, China, etc." I take judicial notice that the Lawyers' Guild is a national organization including many left-wing lawyers. I take judicial notice that there is in this country and in the world a great variety of "thoughts on Cuba, Laos, China, etc."

An examination of the exhibits shows that Exhibit 3A is a short news story stating that another lawyer and Lenske had called a meeting at a hotel for the purpose of organizing a local chapter of the Lawyers' Guild, and that a feature of the meeting would be the showing of a controversial film "Operation Abolition." Exhibit 3B is a rather long letter to the editor, from Lenske, in which Lenske expresses the thought that in "Cuba, Laos, China, etc." this country's actions had been in violation of our own laws and treaties, and in violation of international law.

I regard what I have recited above as a scandal of the first magnitude in the administration of the tax laws of the United States. It discloses nothing less than a witch-hunt, a crusade by the key agent of the United States in this prosecution, to rid our society of unorthodox thinkers and actors by using federal income tax laws and federal courts to put them in the penitentiary. No court

---

* The foregoing opinion was written after the government's petition for rehearing was filed and after appellant responded thereto. The prior opinion of October 5, 1966, not published in the Federal Reporter, is withdrawn.

The petition for rehearing and the suggestion of a rehearing en banc are denied. Judge Chambers would grant the petition and the suggestion for a rehearing en banc.

No further petition for a rehearing is desired.

should become an accessory to such a project.

When the Special Agent's report came in to his superiors, with his naive disclosure at the very beginning of his report that he placed high among the reasons why Lenske should be criminally prosecuted Lenske's being a left-wing lawyer and having unorthodox political and social ideas, his superiors should have immediately removed him from the case and discarded every judgment which was contained in his recommendation. The Special Agent had given his superiors express notice that he was confused with regard to his duties and with regard to the basic ideals of his government. Discarding two and one-half years of dedicated endeavor of the Special Agent would have been a small price to pay to get the Government and its awesome taxing authority back on the path of fairness and decency.

The judgments which the Special Agent formed and embodied in his recommendation that Lenske be criminally prosecuted can only be described as grotesque. His two and one-half years of investigation had convinced him that Lenske had evaded taxes in the amount of $11,465.74 for the year 1955. The trial resulted in a finding that Lenske's taxes for 1955 would have been $414.78. The Special Agent determined Lenske's taxes to be 27 times as much as the court found them to be. On an examination testing his accuracy, the Special Agent would have scored less than 4 out of a possible 100. For the year 1957 the Special Agent's report said that Lenske had evaded $19,412.88 in taxes. The judgment of the court was that his taxes were $1006.18. The Special Agent's report thus charged Lenske with nineteen times as much tax as the court found that he owed. The Special Agent's score was less than 6 out of a possible 100. For the year 1958, the report said Lenske should have paid $7,746.85. The court found that his taxes were $4,682.99, but that he had paid $2,000 in estimated tax. That left him owing $2,682.99. The

Special Agent testified that he had, in his investigation, conducted perhaps 1500 interviews. He might well have found time to look at the Government's record of Lenske's 1958 payments of $2,000 of estimated tax. The Special Agent's report thus attributed three times as much tax to Lenske as he owed for 1958. This was the Special Agent's best score, some 33 out of a possible 100. For 1956, the Special Agent's report said that Lenske should have paid a tax of $5,225.77. The court found that Lenske had no taxable income for 1956, but had a loss of $9,231.59. The Special Agent's examination score for 1956 would be, then, some almost incalculable number below zero.

The Special Agent was, so far as the record shows, technically competent and experienced. Such gross miscalculations as we have recited make it evident that some element, foreign to the functions and duties of a government tax officer, was corroding his judgment. Whether that corrosive element was that he had views differing from Lenske's about the Lawyers' Guild, or about "Cuba, Laos, China, etc." or about other political and social problems, or was something else that we cannot even imagine, the consequence is that no confidence whatever should be placed in the Special Agent's conclusions in this case. Yet he was not only the Government's investigator but the Government's principal witness in the trial. Under his supervision the complicated charts and computations were prepared. He presented and explained them to the court. He testified that he interviewed more than 500 witnesses, perhaps as many as 1500, and read "thousands, thousands" of documents.

I am authorized by Judge Hamley to say that he shares my opinion of the gross impropriety of the motivation of the Government's investigation of this case. The Chief Judge and Judge Hamley are of the opinion that the state of the record in this case does not permit the court to make use of the Special Agent's report. With deference, I think

my associates are in error in this regard.

At the trial before Judge Ross, government counsel, having completed his direct examination of the Special Agent, stated on the record that the Government would submit to counsel for the defense, for cross-examination purposes, all memoranda and statements made by the Special Agent and

> in addition, I am going to take a step contrary to a lot of policies, but I am going to submit, in any event, a so-called Special Agent's report that this agent has made in connection with his duties as special agent.

The court, then, at government counsel's suggestion, examined the report in camera, made certain deletions and ordered that the report be delivered to counsel for the defendant. Government counsel then said, on the record,

> Then counsel for plaintiff will now serve the Special Agent's report on counsel for the defense. May I do this right at the conclusion of the proceedings and save some time?

Nothing appears in the trial court record about the report ever having been marked as an exhibit or received in evidence. It appears from the record that it was in fact delivered to the defendant, since Lenske attempted to cross-examine the Special Agent on the contents of the report. Lenske asked about the newspaper clippings, but after discussion Judge Ross forbade further inquiry along this line, saying, "I'm not going to permit any inquiries into matters which do not concern this tax case."

As we are aware, Judge Ross' death terminated the first trial. Volume 40 was the last volume of the transcript of that trial.

Judge James M. Carter was assigned to re-try the case. He conferred with counsel on April 30, 1963, and thereafter read the 40 volumes of the first trial. On June 21, 1963, he again conferred with counsel, and inquired about the Special Agent's report. He asked if the report was in evidence. Government counsel said that at the former trial the defendant had been given a copy of the report and that a copy was available for the court. The court asked if the report was marked for identification for the record, and government counsel said, "I don't recall whether it was or was not. Probably not."

Judge Carter was given a copy of the report and questioned counsel about items in it. He referred to Exhibit 3A, the newspaper clipping about the Lawyers' Guild affair, saying, "Nothing could interest me less and I don't see how it could particularly interest the defense." He referred to Exhibit 3B, Mr. Lenske's thoughts on Cuba, Laos and China, saying, "That is not an issue in this case and I don't think the defense want to interject it into the case. You don't want things like that, do you? * * * Let's be serious. We are not interested in that, are we, Mr. Burdell?" (Mr. Burdell was Lenske's counsel.) Mr. Burdell replied, "No, I am not, and he is not either." By "he" Mr. Burdell was referring to Lenske, who was present.

Lenske's counsel acquiesced in the court's opinion, and Lenske kept silent. In his brief on appeal to this court Lenske raised the question. The Government made no response to the point. This court, aware from the record that the report existed and had been considered by the trial court and the parties, requested the parties to stipulate that the report should be added to the record and considered on the same basis as if it had been marked for identification. The Government readily so stipulated, but Lenske refused to stipulate. This court, being still of the view that it was entitled to see what had been seen and considered at the trial, ordered that the report be supplied to this court "for identification." That has been done.

The report being available to us, I am unable to understand why we should not admit it in evidence and make use of it in deciding the case.

In Silber v. United States, 370 U.S. 717, 82 S.Ct. 1287, 8 L.Ed.2d 798, the court cited and applied the Court's state-

**30**

ment in the United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555, that:

> In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.

CHAMBERS, Circuit Judge, dissenting on petition for rehearing:

The district judge made 93 pages of findings of fact. I find them well supported by the record. To prove them well supported by the record I would have to attach about a thousand pounds of record and exhibits. Short of that, this case must stand on the different views of the evidence of the majority and myself.

The shortages of income not reported by the defendant were mainly in connection with real estate he was hiding out, not on simple oversights of reporting.

The district court resolved everything in Lenske's favor it could. He had the benefit of virtually all doubt. Still, that court found fraud beyond a reasonable doubt. And, so do I. As I have said before, and repeat, this case is so bad it ought to be affirmed per curiam.

The tragedy of the case is not that Lenske goes free. Internal Revenue can only catch and convict a few of those who cheat the public fisc. The tragedy is that someone might follow the case hereafter. I hope it can be treated as one of those "totality of circumstances" cases. A district court will not have another case exactly like this. Thus, it can find a different totality of circumstances.

As one begins to read the majority opinion and sees early therein the excoriation of the special agent for "sneaking" the files of Lenske out to have them photostated, one knows how the case will come out. Of course, Lenske had given permission to the agents to look. Before the majority opinion was written, I had always thought that permission to see is permission to copy. Further illustrating the hostility which the government has been up against here is the comment that "The Special Agent testified rather petulantly * * *." I find the testimony not petulant.

As above, most of the majority opinion can be answered line for line, but such a course would only benefit the book publisher.

In time, other circuits will assign a rightful place to the majority opinion, and this court will recede from it.