**UNITED STATES of America,
Plaintiff,**

v.

**Frank DeMARCO, Jr., Defendant.**

**No. CR 75–1188–F.**

United States District Court,
C. D. California.

Sept. 25, 1975.

Jay Horowitz, Asst. Sp. Prosecutor, Watergate Sp. Prosecution Force, Los Angeles, Cal., for plaintiff.

Charles A. McNelis, Welch & Morgan, Washington, D. C., Donald C. Smaltz, Los Angeles, Cal., for defendant.

## MEMORANDUM OPINION

FERGUSON, District Judge.

On April 4, 1974, Attorney General William Saxbe directed the Watergate Special Prosecution Force "to investigate and prosecute all violations of law arising out of the preparation of President Nixon's 1969 income tax return and the deductions in subsequent years for the gift of pre-Presidential papers to the National Archives . . . ."

This case involves one of the charges brought pursuant to that assignment.

Frank DeMarco, Jr. was indicted on July 29, 1975 in the Central District of California for alleged false statements made to an Internal Revenue Service special agent in violation of 18 U.S.C. § 1001, and he has moved to dismiss that indictment. The motion is granted for two independent reasons. First, due process and this court's responsibility to supervise the administration of criminal justice require the dismissal of this indictment. A contrary decision would permit the "potential for vindictiveness" proscribed in *Blackledge v. Perry*, 417 U.S. 21, 28, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974) to deter the exercise of rights guaranteed to criminal defendants by federal statute. Second, the failure of the prosecutor to inform the grand jury of the relevant facts preceding the initiation of the decision to charge the defendant in California requires the dismissal of this indictment. Any contrary decision would violate the defendant's right to an "independent and informed grand jury" (*Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962)) and would seriously undermine the proper function of the grand jury in our system of criminal justice.

### Factual Background

The factual background leading to the defendant's July 29, 1975 indictment in California is as follows:

1. Frank DeMarco, Jr. was initially indicted together with Ralph Newman on February 19, 1975 by a federal grand jury in the District of Columbia.

   a. Mr. DeMarco was charged with three offenses:

     i. participation in a conspiracy to defraud the United States in violation of 18 U.S.C. § 371;

     ii. the making of false and fraudulent statements to Internal Revenue Service agents in the District of Columbia in violation of 18 U.S.C. § 1001;

     iii. an endeavor to unlawfully, willfully, knowingly, and corruptly obstruct the proceedings of the Joint Committee on Internal Revenue Taxation of the Congress of the United States in violation of 18 U.S.C. § 1505.

   b. Mr. Newman was charged with two offenses:

     i. participation in a conspiracy to defraud the United States in violation of 18 U.S.C. § 371;

     ii. aiding in the preparation of a false and fraudulent document with knowledge of its falsity in connection with the filing of the

1969 joint federal income tax return of Richard M. and Patricia R. Nixon in violation of 26 U.S.C. § 7602(2).

2. Defendants Newman and DeMarco timely filed motions which insisted upon their statutory right to be tried in the district of their residence. 18 U.S.C. § 3237(b). DeMarco conceded that 18 U.S.C. § 3237(b) did not authorize a transfer of the 18 U.S.C. § 1001 charge against him but contended that that charge too should be transferred to his home district in order to effect the convenience of the parties and witnesses and the interest of justice. Fed.R.Crim. P. 21(b).

3. The government vigorously opposed these motions contending that the charges contained in the indictment were not subject to the transfer provisions of 18 U.S.C. § 3237(b).

4. On April 16, 1975, Judge Oliver Gasch granted the defendants' motion. He, therefore, ordered that the charges against Mr. Newman be transferred to the Northern District of Illinois and that the charges against Mr. DeMarco be transferred to the Central District of California.

5. On April 17, 1975, Charles McNelis, counsel for DeMarco, received a telephone call from Jay Horowitz of the Watergate Special Prosecution Force. In substance, Mr. Horowitz informed Mr. McNelis that the government was considering filing a motion for reconsideration of the order of transfer, that if the defendant successfully transferred his case to California the government would consider bringing more counts against him, and that the government would "restructure" the case against him if it came to California.

After the government filed and lost its motion for reconsideration, Mr. Horowitz in another telephone call told counsel for DeMarco that if DeMarco did not agree to a joint trial with Newman he would be indicted in Los Angeles for the offense which has since become the subject of this motion.

Mr. Horowitz has informed the court that the facts supporting the charge which is the subject of the California indictment were developed long before these telephone calls (indeed long before the indictment was brought in the District of Columbia), and that the government had communicated this fact to Mr. McNelis before DeMarco's indictment in the District of Columbia, but that the government had refrained from filing the charge because venue in the District of Columbia would not lie and the government did not wish to bring two separate prosecutions against the defendant.

Mr. Horowitz further indicates he informed DeMarco's counsel that in restructuring the charges in Chicago (against Newman) and in Los Angeles (against DeMarco) the government would *"perhaps* consent to the dismissal of some of the pending charges." (emphasis added). Moreover he maintains that the "tone" of the telephone conversations was not "threatening."

In short, the government characterizes these telephone conversations as "common and entirely proper discussions between adverse counsel litigating over a complicated procedural issue."

This court finds no basic inconsistency between the renditions of these conversations as reported by opposing counsel. The "tone" of these conversations was probably not threatening; the substance surely was. The government *in an effort to prevent the defendant from asserting his statutory venue rights* threatened him with a new indictment in California. This is not to say that the government has now filed this charge out of vindictive or punitive motives; it is to say that at the time of the telephone conversations, the government deliberately used the threat of a new indictment in California to deter the defendant from exercising his statutory rights. Moreover this court finds that the defendant at the time of the telephone conversations was deliberately placed on notice that if he exercised his statutory venue rights, the prosecution threatened to respond by

"upping the ante." *Blackledge v. Perry,* 417 U.S. 21, 28, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1975). The government's specific promise to drop a charge did not come until after the case had been transferred.

6. The defendant elected to transfer this case to California. During the arraignment on July 28, 1975, Mr. Horowitz informed this court that he intended to present evidence to the grand jury charging the defendant with a violation of 18 U.S.C. § 1001 (for false statements made in California) and that if the grand jury returned an indictment the government would consent to a dismissal of the 18 U.S.C. § 1001 charge (for false statements made in the District of Columbia) contained in the District of Columbia indictment.[1] Mr. Horowitz explained that the government preferred to bring this charge because the statements made in California had been transcribed, but the statements made in the District of California had not. After the defendant filed a motion to dismiss this indictment, the government shifted its position as to which count it intended to drop. In his affidavit of September 5, 1975 (filed in support of the government's opposition to the defense motion), Mr. Horowitz stated that, "the Government still intends to consent to a dismissal of one count of the Indictment—the precise count obviously dependent, in the first instance, upon this Court's rulings upon defendant's pre-trial motions."

7. After this court denied defendant's motions to dismiss the counts contained in the District of Columbia indictment and informed the prosecution that the California indictment would be dismissed, the government moved to dismiss the conspiracy count, citing considerations of trial strategy.

8. At no time did the government inform the grand jury in Los Angeles of the facts surrounding the transfer of the case from Washington, D.C. Indeed the grand jury was not informed that any other charges had been filed against the defendant.

*The Charge of Retaliation*

As previously mentioned, the principles delineated in *Blackledge v. Perry, supra,* call for a dismissal of the California indictment. In that case the defendant Perry was initially charged in North

[1]. "MR. HOROWITZ: Your Honor, there is one other matter which relates to your Honor's scheduling somewhat, although I don't see that it should vary the scheduling which your Honor directed this morning and that is as follows:

It pertains to the Grand Jury and that's why I ask to approach the side bar. We are planning to present evidence to a Grand Jury here and request the Grand Jury to return an Indictment probably on one count charging Mr. DeMarco with an additional offense. We would plan to do so tomorrow, frankly.

Following our doing so that case will be processed in the normal course, obviously, and we will at the appropriate time make a Motion to Consolidate. At the same time that we do, your Honor, we will, if matters go as we hope they go, we will consent to a dismissal of a count which currently is in the Indictment as structured before your Honor.

There are various reasons for this but is essense [sic] the charge which would form the new count would charge Mr. DeMarco with having made false statements to certain officials of the Internal Revenue Service.

THE COURT: 1101?
MR. McNELIS: 1001.
MR. HOROWITZ: 1001. There is a charge as presently constituted which we brought when we were in D.C. when we had venue for it. We did not bring this one because we did not have venue for it, and this one relies in part upon a transcript of Mr. DeMarco's testimony and we believe under all the circumstances that it would be more appropriate to prosecute that charge rather than a charge which currently has been prosecuted against him which, to be sure, there's more than sufficient evidence to support but was not a transcribed interview."

Clearly these remarks manifested the government's intention to drop the false statements (18 U.S.C. § 1001) count of the District of Columbia indictment. The remarks could hardly be interpreted to refer to the conspiracy count (with its attendant multiple overt acts), nor could they be construed to relate to the 18 U.S.C. § 1505 count which involved the transfer of documents.

Carolina with a misdemeanor charge of assault with a deadly weapon. After a trial without a jury, he was convicted. Under North Carolina procedure, the defendant by filing a notice of "appeal" can annul a misdemeanor conviction and obtain an entirely new trial in the Superior Court. The prosecutor responded to Perry's filing of a notice of appeal by obtaining a grand jury indictment charging him with a felony, *i. e.*, assault with a deadly weapon with intent to kill and inflict serious bodily injury. The United States Supreme Court ruled that the initiation of the felony charge violated due process of law. 417 U.S. at 28–29, 94 S.Ct. 2098.

Significantly the Court noted that there was no evidence that the prosecutor "acted in bad faith or maliciously in seeking a felony indictment against Perry." *Id.* at 28, 94 S.Ct. at 2102. The Court insisted that no retaliatory motivation need be present before considerations of due process become relevant. Instead the Court emphasized that a person was entitled to assert his statutory rights "without apprehension that the State will retaliate by substituting a more serious charge for the original one, thus subjecting him to a significantly increased potential period of incarceration." *Id.* The Court looked to the "opportunities for vindictiveness" (*id.* at 27, 94 S.Ct. 2098) in the situation and concluded that the due process clause could not countenance the potential for vindictiveness presented in that case.

◼ Similarly Mr. DeMarco was entitled to pursue his statutory venue rights free of the apprehension that the government would retaliate by filing additional charges. *United States v. Jamison,* 164 U.S.App.D.C. 300, 505 F.2d 407 (1974); *cf. Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). He was entitled to pursue those rights free of threats and intimidation, even from threats presented in a nonthreatening tone.

◼ The government advances a number of superficially attractive distinc-

tions to avoid the force of *Blackledge.* In the final analysis, all of these distinctions are unpersuasive. First, the government contends that the *Blackledge* principles are applicable if, but only if, the constitutional rights and interests protected by the prohibition against double jeopardy are jeopardized. This crabbed reading of *Blackledge* (although consistent with the facts of the case) cannot be reconciled with the sweeping language of the decision. Indeed the Court flatly states that its decision "is not based upon the Double Jeopardy Clause." 417 U.S. at 31, 94 S.Ct. at 2104. The day our Constitution permits prosecutors to deter defendants from exercising any and all of their guaranteed rights by threatening them with new charges fortunately has not yet arrived. The charging power of the prosecutor has been circumscribed in other contexts. *See, e. g., United States v. Berrios,* 501 F.2d 1207 (2d Cir. 1974); *United States v. Berrigan,* 482 F.2d 171 (3d Cir. 1973); *United States v. Falk,* 479 F.2d 616 (7th Cir. 1973); *United States v. Steele,* 461 F.2d 1148 (9th Cir. 1972); *Dixon v. District of Columbia,* 129 U.S.App.D.C. 341, 394 F.2d 966 (1968); *MacDonald v. Musick,* 425 F.2d 373 (9th Cir.), *cert. denied,* 400 U.S. 852, 91 S.Ct. 54, 27 L.Ed. 2d 90 (1970). It is appropriate to limit it here.

But the government contends that its activities in this case should be accepted as analogous to plea bargaining and indeed suggests that if plea bargaining is constitutional, its activities in this case are appropriate *a fortiori.*

◼ The constitutionality of plea bargaining was upheld by the United States Supreme Court in *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). See also *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); *Cortez v. United States,* 337 F.2d 699 (9th Cir. 1964); *People v. West,* 3 Cal.3d 595, 91 Cal.Rptr. 385, 477 P.2d

409 (1970). Essentially the Court in *Brady* sustained plea bargaining because it advanced the goals of the criminal justice system. An early plea of guilty was said to offer better prospects for rehabilitation and "with the avoidance of trial, scarce judicial and prosecutorial resources are conserved for those cases in which there is a substantial issue of the defendant's guilt or in which there is a substantial doubt that the State can sustain its burden of proof." 397 U.S. at 752, 90 S.Ct. at 1471. In short, plea bargaining is accepted because it furthers rehabilitation and promotes the finding of truth in the fact finding process. Thus the Court in *Brady* observed that "We would have serious doubts about this case if the encouragement of guilty pleas by offers of leniency substantially increased the likelihood that defendants, advised by competent counsel, would falsely condemn themselves." *Id.* at 758, 90 S.Ct. at 1474. Thus in keeping with the Court's commitment to safeguard the truth finding process, it has been held that guilty pleas may not be accepted unless there is a factual basis for the plea. *Santobello v. New York, supra,* at 261, 92 S.Ct. at 495; *North Carolina v. Alford,* 400 U.S. 25, 38 n. 10, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); Fed.R.Crim.P. 11.

■ Finally it should be observed that plea bargaining is sanctioned because without it the system of criminal justice could not function effectively. *See Santobello v. New York, supra,* at 260, 92 S.Ct. at 495. Even given the institution of plea bargaining, this country confronts severe backlogs, scarce judicial resources, and overworked attorneys. Perceptions as to the desirability of plea bargaining are no doubt influenced by pragmatic considerations.

■ An examination of the considerations sanctioning the "venerable institution of plea bargaining" (*Parker v.*

*North Carolina,* 397 U.S. 790, 808, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970) (Brennan, Douglas & Marshall, JJ., dissenting)) should make clear that such an institution in no wise authorizes a prosecutor to threaten defendants with additional charges if they invoke guaranteed venue rights. Plea bargaining is said to advance the process of finding truth. Permitting the government to deter the exercise of venue rights would in fact inhibit the process of finding truth. Indeed Judge Gasch in this very case observed that the purpose of the venue statute in question (18 U.S.C. § 3237(b)) was to insure that defendants would be able to call character witnesses on their behalf. The Congress was concerned that defendants would not be able to bear the expenses of defending a trial in a far away district. Permitting defendants to defend in their home districts thus enables them to effectively present their cases. This enhances the fact finding process. Plea bargaining may advance the fact finding process; "venue bargaining" most assuredly does not.

■ Finally while plea bargaining may be necessary for the effective administration of criminal justice, venue bargaining is hardly a necessary component of the prosecutor's arsenal. Indeed the venue safeguards of 18 U.S.C. § 3237(b) would be thoroughly undermined by a contrary decision. Thus the appropriate analogy to be drawn from the facts of this case is found in *Blackledge,* not in *Brady.*

Next the government seeks to distinguish *Blackledge* by contending that since the conspiracy charge has been dismissed, the defendant does not face the prospect of "increased charges." Rather as was the case in the District of Columbia, the defendant is faced with three charges. To borrow terminology from *Blackledge,* the government contends that it has not "upped the ante."[2]

---

2. Indeed the government suggests, somewhat faintly, that, if anything, there is a net decrease in the charges. The rationale for this improvisation is not spelled out by the govern-

ment. Apparently the government supposes that since the conspiracy count takes up more pages of the indictment, it is a more serious charge. The frivolity of this suggestion is

The difficulty with this argument is that the government's proposed *substitution* of charges comes too late. At the time of the telephone conversations with DeMarco's counsel (see section 5 of the factual background, *supra*), the government clearly threatened the defendant with the prospect of increased charges. Due process and this court's responsibility to supervise the administration of criminal justice both require that these kinds of threats not be tolerated. Therefore it is necessary to hold that when the government threatened DeMarco, it lost its right to bring the charges it threatened to bring. Thus this court does not hold that the government can never "restructure" its case after a change of venue. It rather holds that when the government impermissibly uses its charging power as a bargaining tool that its power to bring new charges will be appropriately confined.

Moreover it is by no means clear that the government has not "upped the ante" by proposing the "substitute" charges. Initially the government announced its intention to drop the 18 U.S.C. § 1001 charge contained in the District of Columbia indictment. That charge arose out of statements allegedly made in the District of Columbia, and that charge could not have initially been filed in California since venue would have been improper. Since the defendant had a statutory right to transfer the other charges, the defendant moved to transfer the § 1001 charge rather than face simultaneous prosecutions in two different places. Only after the charges were transferred did the government reveal (in connection with an explanation as to why the California indictment was not earlier filed) that it had a policy of not pursuing simultaneous prosecutions of a single defendant in different places. Thus the defendant transferred the 18 U.S.C. § 1001 charge based on an unfounded fear, and the government now seeks to capitalize on that transfer. It now seeks to prosecute the defendant for charges which it could not otherwise have joined in a single prosecution.

Nor is it clear that the "substitution" of the new 18 U.S.C. § 1001 charge does not place a greater burden on the defendant. The prosecution has made no secret of its belief that the new 18 U.S.C. § 1001 charge is a strong charge. The "substitution" of charges is made precisely because the government believes that the chances for conviction are increased and because it believes that the substitution subjects the defendant "to a significantly increased potential period of incarceration." *Blackledge v. Perry, supra,* at 28, 94 S.Ct. at 2103.

Finally the proposed "substitution" of charges is not really a substitution. The government's motion to dismiss the conspiracy count is in no way conditioned on the court's decision with respect to the new charge. The government's unilateral decision to drop the conspiracy charge is said to be based on "the impact upon this prosecution which the severance of the two defendants would have." What impact the severance of the trial has had upon the government's case is uncertain (the government's case in chief cannot turn upon whether or not Mr. Newman is sitting in this courtroom since it could not have called him as a witness in any event), but it is evident that the government believes the net effect of substituting charges would be to the defendant's disadvantage, *i. e.,* it would "up the ante."

apparent. Similar credence is due the government's offhand assertion that the California indictment is not based on facts which support the earlier indictment. All of the charges against DeMarco relate to the events surrounding the claim and defense of a tax deduction arising from an alleged 1969 gift by former President Nixon to the United States. Moreover, as the government conceded, the conspiracy count embraces the California facts. Even if the facts of the California indictment were wholly dissimilar from the District of Columbia indictment, a different result need not obtain. The threat of increased charges is indefensible whether or not those charges grow out of the same transaction.

Again this is not to say, in the absence of the governmental threats involved in this case, that the government would not be entitled to justify on the record its "restructuring" of the charges involved here. *See United States v. Anderson,* 514 F.2d 583 (7th Cir. 1975); *United States v. Jamison,* 164 U.S.App.D.C. 300, 505 F.2d 407 (1974). In the absence of threats, this court would examine the restructuring in terms of whether or not vindictiveness was present and whether or not future litigants would entertain a reasonable apprehension of vindictiveness. The government concedes, for example, that if it vindictively retaliated to a defendant's assertion of venue rights by filing additional charges (however well founded), dismissal would be appropriate.

█ But this is not a case in which the government merely proposes to "restructure" charges. This is a case in which the government has threatened the defendant with a heavier burden if he should assert his statutory rights. In *Blackledge,* the Court did not permit the prosecutor to justify the filing of a new charge. *But see North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). Rather the potential for vindictiveness was seen to be too severe to justify case by case *ad hoc* justification. If seven members[3] of the Supreme Court could reach such a result in circumstances where the prosecutor had threatened no one, the result reached here must follow *a fortiori.*

*Non-disclosure to the Grand Jury*

█ There is a separate reason why it is necessary to dismiss this indictment. Despite the defendant's colorable claim that the indictment was the product of improper motives and the defendant's colorable claim that the charge in question had been the subject of improper threats, the prosecutor did not disclose to the grand jury that the charge could be attacked as an unjustifiable exercise

of the charging power. The grand jury was entitled to be apprised of that information so that it could make an independent judgment as to whether it was appropriate to return an indictment under the circumstances.

The role and function of the grand jury was recently described in the United States Supreme Court decision of *United States v. Calandra,* 414 U.S. 338, 342–43, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974):

> The institution of the grand jury is deeply rooted in Anglo-American history. In England, the grand jury served for centuries both as a body of accusers sworn to discover and present for trial persons suspected of criminal wrongdoing and as a protector of citizens against arbitrary and oppressive governmental action. . . . The grand jury's historic functions survive to this day.

Thus the Court in *Wood v. Georgia,* 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1970) spoke of the "necessity to society of an independent and informed grand jury." Moreover this perception has been consistently expressed in Court discussions of the role and functions of the grand jury. *See, e. g., United States v. Calandra, supra; United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); *Hoffman v. United States,* 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); *Hale v. Henkel,* 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906); *Ex Parte Bain,* 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887).

██ Clearly the grand jury cannot protect against malicious prosecutions if it is not given information which is material to its determination. Nor is it decisive that the charge in this case is supported by probable cause. The case law is now clear that charges

─────────

3. Justice Rehnquist dissented in *Blackledge;* Justice Powell dissented only on procedural

grounds and did not reach the due process issue discussed above.

brought for unjustifiable purposes must be dismissed even if there be sufficient evidence for conviction. *See, e. g., Blackledge v. Perry, supra; Two Guys from Harrison-Allentown v. McGinley,* 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *United States v. Steele,* 461 F.2d 1148 (9th Cir. 1972); *Dixon v. District of Columbia,* 129 U.S.App.D.C. 341, 394 F.2d 966 (1968). *Lenske v. United States,* 383 F.2d 20 (9th Cir. 1967) (separate opinion).

To be sure, this court is not aware of a case which has held that a prosecutor has a duty to disclose the type of information involved in this case, but it is hardly novel to "recognize the existence of a duty of good faith on the part of the prosecutor with respect to the court, the grand jury, and the defendant." *United States v. Basurto,* 497 F.2d 781, 786 (9th Cir. 1974). Nor is it ground breaking to observe that the "untainted administration of justice is certainly one of the most cherished aspects of our institutions. . . . Therefore, fastidious regard for the honor of the administration of justice requires the Court to make certain that the doing of justice be made so manifest that only irrational or perverse claims of its disregard can be asserted." *Communist Party v. Subversive Activities Control Board,* 351 U.S. 115, 124, 76 S.Ct. 663, 668, 100 L.Ed. 1003 (1956); *Mesarosh v. United States,* 352 U.S. 1, 14, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956); *United States v. Basurto, supra,* at 786–87.

■ If a defendant can appropriately resist prosecution at trial on the ground that the prosecution has launched an indictment for unjustifiable purposes, it makes sense to permit the grand jury to prevent the indictment from being filed in the first place. As the Court explained in *Costello v. United States,*

350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956), grand juries are "pledged to indict no one because of prejudice." Thus if the grand jury's function to stand between the accuser and the accused is to be safeguarded, it is necessary to impose a duty upon the government to reveal to the grand jury information bearing on colorable claims that its motives are suspect.

Whether this duty be based upon the grand jury provisions of the fifth amendment or the due process clause of the fifth amendment, or in the exercise of this court's supervisory jurisdiction (*Bursey v. United States,* 466 F.2d 1059 (9th Cir. 1972), it must be imposed.

Although this court does not find that the prosecution of the California indictment was based upon vindictive motives, it cannot divine what determination the grand jury would have reached, nor can it determine whether or not the grand jury would have wished to exercise its discretion to return an indictment had it been aware of the "venue bargaining" initiated by the government in this case.

Our Constitution wisely provides that no federal prosecution can be maintained unless laymen unfettered by "rigid procedural or evidential rules" (*Costello v. United States, supra,* at 362, 76 S.Ct. 406) decide in common sense that it is fair under the circumstances to bring a defendant to trial. As the Ninth Circuit Court of Appeals stated in *United States v. Basurto, supra,* at 785, "Today, the grand jury relies upon the prosecutor to initiate and prepare criminal cases . . . which come before it." In this case, the government did not present information vital to the grand jury's informed and independent judgment.

Therefore the indictment is dismissed.

The Clerk is ordered to serve copies of this opinion by United States mail upon the attorneys for the parties appearing in this action.