John SMITH, Jr., et al., Appellants,

v.

Nicholas deB. KATZENBACH et al.,
Appellees.

No. 19230.

United States Court of Appeals
District of Columbia Circuit.

Argued May 27, 1965.

Decided Aug. 27, 1965.

Opinion Filed Sept. 3, 1965.

Petition for Rehearing En Banc
Denied Oct. 26, 1965.

Mr. Paul R. Connolly, Washington, D. C., with whom Messrs. Seymour S. Mintz and Robert H. Kapp, Washington, D. C., were on the brief, for appellants.

Mr. Richard B. Buhrman, Atty., Dept. of Justice, with whom Messrs. David C.

Acheson, U. S. Atty., John B. Jones, Jr., Lee A. Jackson and Joseph M. Howard, Attys., Dept. of Justice, were on the brief, for appellees. Louis F. Oberdorfer, Asst. Atty. Gen., and Mr. Frank Q. Nebeker, Asst. U. S. Atty., also entered appearances for appellees.

Before FAHY, BURGER and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge.

This is an appeal by taxpayers charging that agents of the Internal Revenue Service used unconstitutional means to obtain information and seeking equitable relief to prohibit the retention or use of such information by Government officials determining whether his case should be presented to a grand jury. The District Court dismissed for lack of jurisdiction, on the ground that the action is an unconsented suit against the United States, and alternatively for want of equity. The facts are taken as presented in the complaint, amplified by the affidavit attached thereto.

It appears that during a period of about ten weeks, beginning September 17, 1962, books and records of appellants, Smith, a resident of Leaksville, North Carolina, and his wholly-owned company, John Smith & Sons, Inc., also located there, were examined by Revenue Agent Carter, accompanied at times by an associate, in the course of an audit. Shortly before February 5, 1963, Carter made an appointment to resume the examination at Smith's office, but on the appointed date he was accompanied by Special Agents Walker and Brown. Although the special agents were apparently identified as such,[1] Smith was unaware that they had responsibilities dif-

---

1. Smith concedes, in his affidavit, he does "not remember whether Mr. Carter introduced [Walker and Brown] as revenue agents or 'special agents.'" Agents Carter and Walker, on the other hand, in their affidavits submitted in opposition to the motion for preliminary injunction, state not only that Walker and Brown were introduced as special agents but also that Smith actually examined the pocket commission of Walker when the special agents presented their credentials.

Smith denies that he examined the commission. In any event, we accept Smith's account that even if the words "special agents" were used, he "attached no significance to them."

The following quotation from Agent Walker's affidavit reveals additional pertinent details of the February 5, 1963 interview:

During the course of the interview in Mr. Smith's office, which lasted about three hours, it is my recollection that

ferent from those of ordinary revenue agents, i. e., that they had responsibility "for the development of evidence for recommendations pertaining to the criminal features of the case." Smith was interviewed alone in his relatively small office. Special Agent Walker, a skilled interrogator in the field of criminal tax evasion, did most of the questioning. No stenographer was present at the interview, but Brown took notes, not now being made available to appellants.

After the interrogation had been under way for some time, and appellant Smith had supplied full information to the questions asked, including the amount of cash on hand at various times and the fact that he had a locked box in his office and a safety deposit box in the bank,[2] Special Agent Walker said in substance: "You know what your rights are, don't you?" Smith replied, "No, I don't. What do you mean?" Walker responded, "Oh, you know you don't have to answer those questions." Smith said, "No, I didn't know that. I may have already answered some questions I didn't want to answer." Walker continued without interruption to interrogate Smith. At about this time Smith asked Carter, "What is this all about?" Carter replied, "Oh, these men are just here to get information about your tax situation." The investigation continued and Smith continued to cooperate.

In fact, states the complaint, Smith did not know his rights and Walker said nothing more to enlighten him. Specifically, Smith did not know he and his company were undergoing a criminal tax fraud investigation, that anything he stated and data made available might be used against appellants, or that they were entitled to counsel.

Following the questioning, appellant Smith permitted the revenue agents to inspect and inventory both the contents of the small metal box he kept in his office and the contents of his safety deposit box at the bank. The inspection and inventory were concluded at 2:00 p. m. Smith was furnished with a copy of each inventory. No original papers appear to have been taken from either of the boxes at that time.

Information gleaned from these sources and answers to questions propounded on that date are alleged to be damaging to appellants, particularly in that they may assist the Government in its proof in a criminal prosecution based on the net worth method.

Appellant Smith allowed further examination of books and records during later visits between February 6 and 19. On request he allowed the agents to take to their office on February 6 and 19, many books and records, some belonging to Smith and others to his company, for which they gave a receipt.

he received numerous telephone calls, and on a few occasions one of his employees entered the office to confer with him. Mr. Smith did not suggest that he wished to have anyone present during the interview, nor was any mention made by anyone concerning the subject of having an attorney or anyone else present.
Nothing of the above is negatived by anything in appellants' complaint or affidavit.
Carter and Walker each concludes his affidavit with a declaration that he does not have in his possession nor is he aware that the Government has in its possession any of the records of John Smith & Sons, Inc., or John Smith. Appellants do not expressly claim that any of their original papers were retained by the Government. We assume

that all books and documents have been duly returned.

2. Smith avers in his affidavit that before he was warned, "Mr. Walker asked me a great many personal questions, among them questions about my education, family, marriage, divorce, remarriage, children, what they did, whether I had acquired money by gift or inheritance, whether I gambled, whether I borrowed money, the nature and manner in which I operated my company, whether I kept substantial amounts of cash on hand, and whether I had a safety deposit or a locked metal box." He further avers that "although disturbed by the personal nature of Mr. Walker's questions, I answered them freely and to the best of my ability."

On February 21, 1963, Smith retained counsel in connection with this matter. Thereafter, on March 18 and 20, the agents returned and were given additional books and records against receipt. By letter dated April 23, 1963, W. J. Bookholt, Regional Commissioner, requested another appointment for re-examination of Smith's books and papers "in order to properly verify your return."

The gravamen of the complaint is that the three revenue agents, and unknown others working in participation with them, by the acts set forth and by recommending prosecution of appellants, have violated the constitutional rights of both appellants to counsel under the Sixth Amendment and appellant Smith's right to refrain from incriminating himself under the Fifth Amendment. The recommendations of the Internal Revenue Service that appellants be prosecuted under Section 7201 of the Internal Revenue Code of 1954, and perhaps other sections, are under consideration in the Department of Justice, and appellees, defendants below, are the cognizant officials in the Department.[3] Appellees do not recognize appellants' claims of unconstitutionality. The action seeks to prevent appellees from making any use of the evidence acquired in violation of constitutional rights [4]—either by considering such evidence as the basis for a criminal prosecution of appellants; permitting such evidence to be presented to any court or grand jury; disclosing such evidence to others or using such evidence to guide any further investigation.

The contention that the court lacks jurisdiction because this is an action brought against the United States without its consent invokes the doctrine of sovereign immunity and the sub-doctrine prohibiting the maintenance of actions whose essential nature and effect are such as to make plain that the judgment sought would "interfere with the public administration." Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947). Restraining the Attorney General from enforcing the criminal laws, a duty with which he is expressly charged, see 28 U.S.C. § 507, is said to be a manifest interference with public administration, cf. Kennedy v. Rabinowitz, 115 U.S.App.D.C. 210, 212, 318 F.2d 181, 183 (1963).

There are some gasps of vitality left in this fading doctrine of sovereign immunity—notably in cases involving Government property. Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed. 2d 168 (1962). But it is lifeless when offered as a defense barring examination of a plea that action threatened by an executive official transcends constitutional limitations. It is the American doctrine that a suit against an official threatening to act unconstitutionally stands in theory as a suit against him personally and individually even though the action he takes or threatens is of the kind which only a Government official can take. His action is deemed the action of the Government in form, but not in substance. Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 690, 702, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). This approach sustaining jurisdiction is ap-

3. The United States Attorney's Manual provides that the "final decision whether to initiate or decline presentation is made by or on behalf of the Assistant Attorney General in charge of the Tax Division." The action was brought against the then Assistance Attorney General (Louis F. Oberdorfer), the then Acting Attorney General (Nicholas deB. Katzenbach), the Chief of the Criminal Section of the Tax Division (Fred G. Folsom), and one attorney in that section assigned to this case (Charles A. McNelis).

4. This is identified as any document which contains or refers to the interrogation of Smith on February 5, and examination of Smith's boxes on that date; the examination of appellants' books and papers from February 6, through March 20; and the interviewing of persons and obtaining of documents which came about as a result of leads obtained from such unlawful interrogation and examination.

plicable to a suit brought against an attorney-general, and is available not only in the familiar situation of threatened enforcement of an unconstitutional statute, but also where an individual action is challenged on constitutional grounds. Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951).

The Government's invocation of sovereign immunity, notwithstanding the intrenched exception for constitutional cases, rests on the argument that appellants' constitutional contentions are frivolous. The doctrine whereby a court denies jurisdiction to entertain a suit upon the basis of a consideration of its merits seems to be an accepted feature of this field of law, Larson v. Domestic & Foreign Commerce Corp., supra, 337 U.S. at 690, 69 S.Ct. 1457, though one rooted in paradox, see Bell v. Hood, 327 U.S. 678, 682–683, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

We find it unnecessary, however, to discuss the merits of appellants' contentions, even for the limited purpose of deciding whether those contentions are substantial enough to support jurisdiction in the District Court, for assuming that they are we are of the view that the complaint should be dismissed, without determination of the merits, for lack of equity jurisdiction.

Want of equity jurisdiction, while not jurisdictional in the sense of the power of the court to decide the case, is a principle of sufficient moment that it is properly raised even on the court's own motion, and has particular importance when the court is being asked in effect to take action in anticipation of a criminal proceeding in another forum. Douglas v. City of Jeannette, 319 U.S. 157, 162, 63 S.Ct. 877, 87 L.Ed. 1324 (1943).

The District Court's perspective was unduly foreshortened by its focussing on the issue whether appellants have an adequate remedy at law by motion under Rule 41(e) of the Federal Rules of Criminal Procedure in the United States District Court for the Middle District of North Carolina.

Appellants challenge the adequacy of that remedy, saying that there is uncertainty whether Rule 41(e) relief extends to suppression of oral statements, or applies to admissions obtained in violation of the Sixth Amendment; that appellees' avowed intention to make their decision without notice to appellants may leave appellants irreparably injured by the fait accompli of an indictment; that appellees may renew their argument below that appellants should be left to their objection at trial and persuade the District Court at the place of trial to enter a non-appealable order reserving ruling until trial, see DiBella v. United States, 369 U.S. 121, 129–130, 82 S.Ct. 654, 7 L.Ed.2d 614, n. 9 (1962).

The express provisions of Rule 41(e) seem to fall short. The rule provides that a person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for return of the property and suppression of its use as evidence. The motion to suppress evidence may also be made in the district where the trial is to be held. Rule 41 (g) provides that the term "property" includes "documents, books, papers and any other tangible objects."

Appellants' ability to obtain relief is not confined, however, to the instances expressly covered by Rule 41. That Rule is a crystallization of a principle of equity jurisdiction. That equity jurisdiction persists as to situations not specifically covered by the Rule. Alternatively the same result can be reached by a broad reading of the Rule. Here we find an authoritative exposition by the Court of Appeals for the Fourth Circuit, which would seem to resolve most of appellants' expressed doubts, in Austin v. United States, 297 F.2d 356 (1961). Judge Sobeloff, reviewing pertinent au-

thorities,[5] concluded that if evidence is taken by Government officials in violation of a person's rights under either the Fourth Amendment or the Fifth Amendment, he is entitled to institute proceedings to restrain the use of the evidence against him, and to do so in anticipation of the indictment, by restraining presentation to the grand jury, without being subject to the objection of prematurity. The court expressly rejected the argument that it was only a matter for the discretion of the court, if a denial of constitutional right were established, whether to grant or withhold relief sought in advance of the indictment (see p. 359 of 297 F.2d). Moreover, the court quoted and followed the opinion of Judge Learned Hand in In re Fried, 161 F.2d 453, 1 A.L.R.2d 996 (2d Cir. 1947), cert. dismissed on motion of Solicitor General, 332 U.S. 807, 68 S.Ct. 105, 92 L.Ed. 384 (1947), that the rule evolved for suppression as evidence of tangible property seized in violation of the Fourth Amendment applies equally to confessions procured in violation of the Fifth Amendment.

In our circuit, as in the Fourth Circuit, motions to suppress oral confessions are permissible. They have indeed become commonplace as the method for raising pre-trial objections that confessions have been secured in violation of Rule 5(a). This judicial development has been a response to a felt need, reflecting the inherent judicial control over cases looming or on file. The hoary maxim that equity is preoccupied with rights in property has given way in our time to an increasing vigilance in the protection of personal and civil rights.

In view of *Austin's* breadth we must at least consider the possibility that the filing of suit here rather than in North Carolina is ascribable not so much to concern over procedural inadequacy as to a desire to avoid the adverse ruling on the merits in Turner v. United States, 222 F.2d 926 (4th Cir. 1955), which found no violation of the taxpayer's rights under the Fifth Amendment in a similar investigation by revenue agents. The problem of forum shopping leads us to point out that our denial of relief does not depend on the demonstration of the remedies available locally under *Austin*, but rather on the conclusion that the appropriate Federal courts for disposition of such controversies are those in the districts either where the property or confession was taken or where the trial is to be held. Those are the districts provided for in Rule 41(e). And those are the districts where the courts have traditionally exercised the independent equity jurisdiction that has both been crystallized in the rule and persists after its adoption.

The rationale of the cases relied on by Judge Sobeloff (see note 5), is that the petition for relief is addressed to the inherent disciplinary power of the court over the officers of the court having control of papers for purposes of prosecution. See Go-Bart Importing Co. v. United States, 282 U.S. 344, 355, 51 S.Ct. 153, 75 L.Ed. 374 (1931); United States v. Maresca, 266 F. 713, 717 (S.D.N.Y.1920). The point, as put by Judge Sibley, is that even in the absence of indictment the court may "reach forward to control the improper preparation of evidence which

---

5. Perlman v. United States, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950 (1918); Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921).

If the song of Austin has ended, the melody may linger on in District Court rulings and attitudes, guided by its wisdom though no longer channeled by its mandate. We make this comment in view of the advice in appellants' supplemental memorandum in support of rehearing, that they recently discovered that Austin, cited without qualification by both parties, had been recalled by an unpublished order of the Court of Appeals for the Fourth Circuit, dated April 6, 1962. The recall was on the ground that the order reversed in Austin in November 1961, had been held interlocutory, and not appealable in advance of final judgment, in Di Bella v. United States, 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614, decided March 19, 1962. In any event, as our opinion makes clear, our determination of lack of equity persists even where the taxpayers face an adverse decisional climate at home.

is to be used in a case coming before it, and \* \* \* restrain oppressive or unlawful conduct of its own officers." Foley v. United States, 64 F.2d 1, 3 (5th Cir. 1933).

In coping with violation of requirements governing searches and seizures the "power of the federal courts extends to policing those requirements and making certain that they are observed" by federal law enforcement agents. See Rea v. United States, 350 U.S. 214, 217, 76 S.Ct. 292, 294, 100 L.Ed. 233 (1956), enjoining a narcotics agent from using the fruits of his unlawful seizure by testifying in a state proceeding. Compare the opinion of Judge Wyzanski that the *Rea* case points the way to enjoin Internal Revenue agents and other federal enforcement officers "from holding or using property they unlawfully seized." Lord v. Kelley, 223 F.Supp. 684, 689 (D. Mass.1963), appeal dismissed, 334 F.2d 742 (1st Cir. 1964).

The supervisory authority of the district court over government attorneys and enforcement officers which constitutes the fountainhead of this special jurisdiction has hitherto been exercised at two points of control: to avoid unlawful ingress into the executive branch, or egress out of the executive branch, as on transmittal to the grand jury. Rule 41(e) does not establish any jurisdiction in the District Court for the District of Columbia based on receipt by officials in Washington of property unlawfully seized elsewhere or copies thereof. Such equitable jurisdiction may exist in that court in an exceptional case, possibly a case where there is no more appropriate district court which has the power, assuming its acceptance of plaintiff's views, to grant relief effective to cope with the unlawful actions or threatened actions. Conceivably there may be an overriding interest in a case involving a nationwide program that may warrant the exercise of equity jurisdiction in this district,[6] an interest fortified by avoidance of multiplicity of actions.

These appellants do not present such an exceptional case.

■ The Federal judicial system contemplates supervision by the Federal district courts of the nation over the government attorneys and enforcement officers acting within their districts, a supervisory jurisdiction possessed in turn on review by the several courts of appeals and ultimately by the Supreme Court. Our geographical location does not properly confer on our district court an equivalent supervision reaching out, to use Judge Sibley's phrase, over the law enforcement officers and attorneys throughout the nation through the conduit of the responsibility of Cabinet officials in Washington. Nor would it promote orderly administration of justice if the District of Columbia were to become a forum widely available for all the purposes, good or bad, associated with forum shopping. We may properly concentrate our energies and concern on our supervision over the administration of criminal justice within the District of Columbia, see Fisher v. United States, 328 U.S. 463, 476, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946); Griffin v. United States, 336 U.S. 704, 712–718, 69 S.Ct. 814, 93 L.Ed. 993 (1949).

■■ To gain the perspective needful for this case we stretch our canvas beyond the traditional rubric of adequacy of remedy at law. A court properly exercises its discretionary powers by withholding relief that may involve interjection into criminal proceedings in another forum, particularly where it adheres to a policy indicated by Congress, as here in Rule 41(e), of the course of ultimate determination of questions involved in such proceedings. See Douglas v. City of Jeannette, 319 U.S. 157, 162–163, 63 S.Ct. 877, 87 L.Ed. 1324 (1943). Factors of public interest involved in optimum distribution of court burdens with appropriate concern for localities of origin and impact of litigated controversies are properly taken into account in

---

6. Cf. Westinghouse Elec. Corp. v. City of Burlington, 122 U.S.App.D.C. ——, 351 F.2d 762, decided June 9, 1965.

the exercise of judicial discretion. See Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508–509, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). Such broad considerations of public interest are appropriately considered by courts in going further both to give and withhold equitable relief than is customary when only private interests are involved. Virginian Ry. Co. v. System Federation, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937).

█ Accordingly we would withhold relief even if the rulings of the indicated forum reflected a decisional climate adverse to appellants' prayers. See e. g. Centracchio v. Garrity, 198 F.2d 382 (1st Cir.), cert. denied 344 U.S. 866, 73 S.Ct. 108, 97 L.Ed. 672 (1952), which conspicuously refrained from endorsing the ruling of In re Fried concerning propriety of actions to suppress oral confessions, and considered that broadest equitable considerations of public interest lie in deferring rulings to the trial rather than on pre-indictment petition. Although pre-trial motions to suppress oral confessions are widely entertained in our circuit, we should not on that account become the means of circumventing contrary rulings of the cognizant circuit.

Moreover in such matters as the timing of the consideration of constitutional contentions here presented—pre-indictment; pre-trial; at trial, but before the jury is convened, etc.—there may well be significant differences between districts in calendar congestion and other matters affecting the administration of criminal justice. The hobgoblin of differences in attitude need not terrorize the Federal judicial system into a straitjacket. This is a proceeding rooted in equitable principles and a flexibility in procedural approach may well be the most productive of the true jewel of consistency—the safeguard of fundamental rights of claimants without unnecessary strain on the general administration of justice.

The order dismissing the complaint without determination of the merits is

Affirmed.