**UNITED STATES of America,
Plaintiff,**

v.

**Dennis BANKS, Defendant.**

**UNITED STATES of America,
Plaintiff,**

v.

**Russell MEANS, Defendant.**
**Nos. CR73–5034, CR73–5062, CR73–5035
and CR73–5063.**

United States District Court,
D. South Dakota, W. D.

Oct. 9, 1974.

William F. Clayton, U. S. Dist. Atty., D. S. D., and R. D. Hurd and David R. Gienapp, Asst. U. S. Attys., Sioux Falls, S. D., and Earl Kaplan, Dept. of Justice, Washington, D. C., for plaintiff.

Mark Lane, St. Paul, Minn., Douglas Hall and Larry B. Leventhal, Minneapolis, Minn., for defendant Banks.

William M. Kunstler, New York City, and Kenneth E. Tilsen, St. Paul, Minn., for defendant Means.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

This memorandum decision concludes the trial stage of the government's case against two leaders of the 1973 occupation of Wounded Knee, South Dakota, the historic Indian village.[1] The occupation lasted seventy-one days and the trial lasted slightly over eight months. Although the trial was often protracted and tedious, it came to a swift end. After deliberating the case for about nine hours, one of the jurors became ill and could not continue deliberations. The government would not agree to accept the verdict of the remaining eleven jurors. In the meantime the defense team filed a motion for judgment of acquittal, thus giving this court the alternative of granting a mistrial or ruling on the motion. I have decided to dismiss all charges remaining in this trial.

Defendants' motion for judgment of acquittal is based generally on allegations of government misconduct. The alleged misconduct consists of the following: 1) conspiracy to suborn perjury and to cover up said subornation in the case of Louis Moves Camp, a prosecution witness; 2) suppression of an FBI statement exposing the perjury of Alexander David Richards, a prosecution witness; 3) illegal and unconstitutional use of military personnel and material at Wounded Knee and the government's effort to cover up said use; 4) violation of applicable professional, ethical and moral standards; and 5) various other incidents of governmental misconduct. For the reasons given below, this court treats defendants' motion as a motion for dismissal and grants judgment of dismissal.

## TREATMENT OF THE MOTION

It is settled that in ruling on a motion a court has the prerogative of granting alternative relief if it decides that the relief requested by the moving party is for any reason inappropriate. *See e. g.,* Mesarosh v. United States, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956), wherein the government moved for a remand to the district court to determine the effect of false testimony and the Court ordered a new trial. This court believes that a judgment of acquittal would be inappropriate under the instant circumstances or, at least, less appropriate than a judgment of dismissal.

█ █ A motion for judgment of acquittal can be based only on the grounds that "the evidence is insufficient to sustain a conviction." 2 Wright, Federal Practice and Procedure, Sec. 466 at pp. 252–253 (1969). A motion for judgment of dismissal on the grounds of government misconduct, on the other hand, usually is grounded on the allegation that the defendant cannot receive a fair trial now or at any time in the reasonably foreseeable future and, thus, cannot be afforded due process of law. United States v. Banks, 374 F.Supp. 321, 323 (D.S.D.1974). *See generally,* United States v. Heath, 260 F.2d 623 (9th Cir. 1958).

█ This court finds it unnecessary to reach the constitutional question of whether the prosecution's conduct has prejudiced the trial to the point that due process was offended. Instead, this is, in my opinion, an appropriate set of circumstances for utilization of this court's supervisory power. Because I am ruling

---

1. For background see my other memorandum decisions arising from the prosecution of the occupation leaders. 368 F.Supp. 1245 (D. C.1973); 374 F.Supp. 321 (D.C.1974); and 383 F.Supp. 368 (D.C.1974).

on the motion through use of the supervisory power and am not making an evaluation of the sufficiency of the evidence, a judgment of acquittal would be inappropriate. It is true that a judgment of dismissal is not the only possible remedy in this situation, i. e. a new trial could be ordered. It is my belief, however, that the misconduct by the government in this case is so aggravated that a dismissal must be entered in the interests of justice.

## THE COURT'S SUPERVISORY POWERS [2]

 This court has supervisory powers over the administration of justice. McNabb v. United States, 318 U.S. 332, 340, 63 S.Ct. 608, 613, 87 L.Ed. 819, (1942). It is my duty to "[establish] and [maintain] civilized standards of procedure and evidence." *Id.* This power extends at least to government attorneys and enforcement officers acting within this district. Smith v. Katzenbach, 122 U.S.App.D.C. 113, 351 F.2d 810, 816 (1965). The attorneys' and enforcement officers' conduct need not be so unfair or imprudent as to offend "due process" before exercise of this supervisory power is appropriate. McNabb, *supra* 318 U.S. at 340, 63 S.Ct. 608. Instead the supervisory power can be utilized whenever the administration of justice is tainted:

> The untainted administration of justice is certainly one of the most cherished aspects of our institutions. Its observance is one of our proudest boasts. This Court is charged with supervisory functions in relation to proceedings in the federal courts. (citation omitted) Therefore, fastidious regard for the honor of the administration of justice requires the Court to make certain that the *doing of justice be made so manifest that only irrational or perverse claims of its disregard can be asserted.* Com-

munist Party of the United States v. Subversive Activities Control Board, 351 U.S. 115, 124, 76 S.Ct. 663, 668, 100 L.Ed. 1003, (1955) (emphasis added).

 It is this court's feeling that when the prosecutor acts in bad faith in complying with the orders and inquiries of the court the administration of justice is tainted and the court should, or at least has a right to, formulate a remedy through use of its supervisory powers. Because I have come to the conclusion that the prosecutor and possibly other law enforcement officials have conducted certain aspects of this trial in bad faith, it becomes my duty to devise a remedy.

 The remedy should be directly related to the seriousness of the misconduct, i. e. serious misconduct warrants a more drastic remedy than does minor misconduct. It is my opinion that the misconduct in this trial is serious and when weighed with other factors warrants dismissal of all charges against the defendants in this case. The pertinent additional factors are as follows: 1) The misconduct here has continued even subsequent to my earlier admonitions and warnings; 2) defendants have already been subjected to an eight month trial, the length of which is at least partially due to government negligence in complying with my discovery orders; (3) the government has other cases awaiting trial against each of the defendants. I feel that the interests of justice are best served by dismissal.

## EARLIER MOTION BASED ON MISCONDUCT

 Defendants, earlier in this trial, moved for dismissal on the grounds of governmental misconduct. This court denied that motion. United States v. Banks, *supra.* As background for today's ruling it should be pointed out that the government's actions that prompted the earlier motion moved me

2. For an analysis of federal courts' supervisory powers *see* "The Supervisory Power of the Federal Courts," 76 Harv.L.Rev. 1656 (1963).

"to the brink" of dismissing the case.[3] *Id.* at 331. The principal reason for denying that motion was that, in my opinion, the alleged misconduct up to that time was the result of negligence rather than bad faith on the part of the prosecution. Whether misconduct is the result of negligence or of bad faith must be determined by analyzing the totality of surrounding circumstances and past conduct is certainly a pertinent factor to be considered in making such an analysis. When a pattern of negligent conduct becomes apparent, it becomes a permissible, and possibly compelling, inference to say that bad faith is present. When bad faith is found, the exercise of this court's supervisory power, I believe, comes into play.

In denying the earlier motion for dismissal I warned the government that future misconduct would warrant renewal of the motion to dismiss. *Id.* at 335–336. Defendants allege that there has been misconduct subsequent to that ruling, and have, in essence (because I am treating their motion as one for dismissal), renewed their motion. Because of the series of incidents of government misconduct, which, I feel, form a pattern throughout the trial, I am forced to conclude that the prosecution acted in bad faith at various times throughout the course of the trial and was seeking convictions at the expense of justice. Therefore, the remaining charges against the defendants must be dismissed. The incidents of government misconduct subsequent to defendants' earlier motion are detailed below.

## THE LOUIS MOVES CAMP INCIDENT

The story of Louis Moves Camp's part in this trial is an interesting one indeed. To provide a background, Moves Camp is a former member of the American Indian Movement. After the prosecution had initially rested its case in this trial, he came forward and volunteered to testify against the defendants.

*A. False Testimony.* The government, suspecting that Moves Camp might be a "ringer", ordered that he be "checked out." This was accomplished by having FBI agents interview him extensively. Before he took the stand to testify, the government's chief prosecutor and the FBI agent in charge of this case requested that Moves Camp be administered a lie detector test. This request was denied by Joseph Trimbach, the FBI special agent in charge of Minnesota, North Dakota, and South Dakota. Although the chief prosecutor could have demanded a lie detector test, he decided not to do so. The fact, however, that the prosecutor initially desired a lie detector test indicates to this court that he may have suspected that Moves Camp would give false testimony.

Moves Camp subsequently testified that he was in the village of Wounded Knee from the beginning of the occupation of Wounded Knee until approximately April 25, 1973. A defense witness, Jay West, then testified, as impeachment, that he had met Moves Camp in California on approximately March 17, 1973 (St. Patrick's Day), and that

---

3. FBI negligence or dilatoriness in complying with my discovery order pushed me "to the brink." The details of the government's failure to exercise diligence are put forth in my earlier opinion, 374 F.Supp. at 328–331. Upon more mature reflection I am no longer certain that my refusal to dismiss at that time was the correct decision. I still find the Joseph Trimbach incident particularly disturbing. Trimbach testified that he had neither seen nor signed an affidavit supporting a request for a wiretap authorization. This, it developed, was untrue. It is incred-

ible that a person in Trimbach's position, and involved in a "limelight" case could suffer from such a grievous lapse of memory.

Furthermore, when Trimbach's affidavit finally surfaced, the defense team was initially provided only the middle page of its three pages. The page bearing Trimbach's signature was conspicuously absent. The whole Trimbach scenario is extremely bizarre and it is increasingly difficult for me to believe that the government was making an honest effort to comply with my discovery orders.

Moves Camp had stayed at his or his brother's home, both in California, from that time until they traveled to South Dakota together after the occupation ended. Other impeachment witnesses testified that Moves Camp had appeared on television programs and given speeches on college campuses in California during the same time period that he claimed to be in Wounded Knee. This testimony was supported by unimpeached documentary evidence, *i. e.* television station logs and handbills advertising his campus appearances. It is fair to say, giving the government the most favorable finding possible, that the testimony and documentary evidence contradicting Moves Camp was more believable than was his testimony. The mere fact that there was conflicting testimony is not unusual. What is disturbing, however, is that the prosecutor could have and should have conducted a more thorough investigation of Moves Camp and his tentative testimony and he failed to do so. Had a lie detector test been administered it is quite likely that Moves Camp's questionable credibility would have been discovered.

Furthermore, the prosecutor, in his affidavit in response to this motion, concedes that he knew, as early as the first day of Moves Camp's trial testimony that the defense would offer testimony directly contradictory to Moves Camp's testimony, *i. e.* that Moves Camp could not have been in Wounded Knee at particular times because he was in California at those times. Notwithstanding his possession of this knowledge, the prosecutor conducted no investigation of Moves Camp's story. He made no effort to correct, qualify, or clarify Moves Camp's testimony even after it became apparent that the overwhelmingly more believable evidence indicated that Moves Camp's testimony was, at least in part, false. It is this court's opinion that the prosecutor was grossly negligent in failing to verify Moves Camp's testimony, and further, in failing to offer an explanation or correction of his testimony in the face of overwhelming contradictory evidence. His conduct here at least borders on violation of the American Bar Association Standards on the Prosecution Function, section 5.6(b). The text of that section follows:

> It is unprofessional conduct for a prosecutor knowingly to offer false evidence, whether by documents, tangible evidence, or the testimony of witnesses.

The commentary to this section explains:

> It is so elementary that it hardly calls for comment that a prosecutor, in common with all other advocates, is barred from introducing evidence which he knows to be false. This obligation applies to evidence which bears on the credibility of a witness as well as to evidence on issues going directly to guilt. Napue v. Illinois, 360 U.S. 264 [79 S.Ct. 1173, 3 L.Ed. 2d 1217] (1950). *Even if false testimony is volunteered by the witness and takes the prosecutor by surprise rather than being solicited by him, if he knows it is false his obligation is to see that it is corrected. Ibid.*; see United States v. Poole, 379 F.2d 645 (7th Cir. 1967). Although some courts have granted new trials to the defendants even where the prosecutor was unaware of the falsity of the evidence, see Barbee v. Warden, 331 F.2d 842 (4th Cir. 1964), disciplinary action against prosecutors should be limited to those cases where the falsity of the evidence was known to, or reasonably should have been discovered by the prosecutor. (emphasis added).

It is unnecessary for this court to decide whether the prosecutor's conduct in offering and failing to correct obviously false testimony was deliberate or only the result of negligence. Neither is it necessary to decide whether this particular instance of misconduct standing alone is sufficient to warrant dismissal. The question is whether the *totality* of the prosecutor's conduct was sufficiently offensive to our traditional notions of justice to demand exercise of the supervisory power.

*B. Deception of the Court.* The second point in the Moves Camp saga involves what I believe to be intentional deception of this court. The background is as follows: On August 27, 1974, Mark Lane, counsel for defendant Banks, raised with the court, at the bench, the possibility of Moves Camp's involvement in a rape incident in River Falls, Wisconsin, while Moves Camp was under the "protection" of the FBI. Charges were never filed against Moves Camp. The evidence shows, however, that he was a suspect in the incident and was released after FBI agents had conferred and spent several hours with the acting state prosecutor and the police officers in River Falls. The acting state prosecutor testified that he had conferred with the alleged rape victim and her mother. As a result of that conference and an analysis of the "case" he decided not to prosecute. The evidence also indicates that the FBI agents informed the Wisconsin prosecutor and police that Moves Camp was to be a witness in the Wounded Knee trial. Defendants contended, of course, that the FBI influenced the Wisconsin prosecutor, and Moves Camp, in return, gave testimony intended to be favorable to the government.

When the possibility that such an incident might have occurred was brought to this court's attention, the government's chief prosecutor, at the bench, denied having any knowledge of it. He indicated to this court that Moves Camp may have been arrested on a public intoxication charge but not on anything "more substantial." Subsequent testimony by the FBI agents "protecting" Moves Camp shows that they reported the rape incident to Philip Enlow, their superior in the FBI, and that they believed that Enlow had passed the information on to the chief prosecutor. It is possible that Enlow did not inform the prosecutor, but it is, I feel, unlikely. It is more likely that the prosecutor was informed of the incident and tried to keep it from the defense and the court out of fear that the incident would be paraded before the jury. Whether the incident should have been presented to the jury for its consideration is not relevant here; that determination was for the court to make, and to make unhandicapped by the prosecutor's or FBI's attempts to keep the incident secret.

As stated above, it is possible that Enlow did not inform the prosecutor about the rape incident. If so, he was either negligent or deceitful and the government is saddled with his conduct.

### THE RICHARDS INCIDENT

In this incident the prosecution elicited testimony from Alexander David Richards, a sixteen year old boy, that was contradictory to the information that he had given the FBI earlier. This information contradictory to his testimony had been transcribed to a witness interview form, but this particular interview was not made available to the defense until after Richards' testimony (both direct and cross) was completed. Because of the prosecution's failure to provide this impeaching form to the defense prior to the completion of Richards' testimony (when they had provided other 302 reports of FBI interviews) so that it could be used on cross examination, this court granted a motion to strike all of his testimony.

It is my feeling that the prosecutor's offering of testimony that was directly *contradicted by a document in his* possession was inexcusable and possibly violative of ABA Standards on the Prosecution Function, section 5.6, *supra.* If it was not a deliberate deception, it was, at least, grossly negligent conduct.

### MILITARY INVOLVEMENT

The fact that there was unlawful military involvement at Wounded Knee is not relevant for the purpose of ruling on the present motion. Such involvement had no influence on government conduct during the course of this trial, which is the central question here. Furthermore, two counts have already been dismissed because of unlawful military involve-

ment. *See* United States v. Banks, 383 F.Supp. 368 (D.S.D.1974). The pertinent question is whether the government attempted to "cover up" the military involvement.

The information detailing the extent of military involvement at Wounded Knee was not immediately available to either the FBI of the prosecutor's office. Nevertheless, taking this fact into consideration, it is my feeling that the prosecutor was either deliberately or negligently dilatory in searching for such information and providing it to defense counsel. Even after the "Jackson report"[4], the key document in this regard, was finally received, it developed that only one part of it had been provided to defense counsel. The only explanation given by the prosecution was to the effect that they did not realize initially that there were two parts to the Jackson document, and that after realizing that there were two parts they thought they had provided both parts to the defense. The Jackson document was important in that it provided the first lead to military documents detailing the full extent of military involvement at Wounded Knee. The government's failure to provide the full report was negligent, at best.

There is further evidence indicating that the government may have sought to conceal the extent of military involvement. When Joseph T. Sneed, then "chief of staff" for the Justice Department at Wounded Knee and now circuit judge of the Ninth United States Court of Appeals, was asked whether he had a line of authority to the Defense Department relative to Wounded Knee, he replied "No line of authority, of course. We did consult with the defense department from time to time in connection with borrowing equipment." The documentary evidence that surfaced later makes it clear that this answer was at best misleading and did not reveal the whole truth. It is also apparent that cross examination of Sneed was impeded by the fact that the documentary evidence that could have been used to attack or qualify Sneed's answer was not made available to the defense until later.

It is, in my opinion, a fact that material vital to the defense in attacking two counts of the indictment was not provided them in a prompt and open manner. Although this failure to provide information that turned out to be important to the defense may have been inadvertent and did not prejudice the final disposition of these counts, it is another example of negligence, and possibly gross negligence, on the part of the prosecution team.

Again, this is an instance that, standing alone, possibly would not constitute misconduct sufficient to warrant dismissal. It does, however, weigh against the government in deciding this motion.

## REFUSAL TO ACCEPT THE VERDICT OF ELEVEN JURORS

After the case was sent to the jury one of the jurors developed a health problem and was unable to continue deliberations. This presented two alternatives: a mistrial or an agreement under Rule 23(b) by counsel for both sides to accept the verdict of eleven jurors. The defense agreed to accept the verdict of eleven jurors, but the government, despite my efforts to importune acceptance of such a verdict, refused. This was the exercise of a statutorily specified right, and thus, in itself, does not even approach misconduct.

▮ The reasons given by the chief prosecutor to the media for refusal to accept the verdict of eleven, however, constitute a violation of the spirit in which a prosecutor should function. It is beyond question that a prosecutor's duty is to insure that justice is done, and not simply to seek convictions. Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Notwithstanding the duty to seek justice

---

4. The "Jackson report" is a document authored by the Senate Committee on Interior and Insular Affairs chaired by Senator Henry Jackson of Washington.

rather than convictions, and the importance of maintaining the appearance as well as the substance of justice, the chief prosecutor made several statements to the media to the effect that he would not agree to accept the verdict of eleven jurors because he felt that the chances of obtaining a conviction from the remaining jurors were "slim." This blatant attempt to obtain a retrial and thus correct the many errors of the past eight months is a violation of the duty of the prosecutor and warrants exercise of this court's supervisory powers.

## CONCLUSION

This court is mindful of the heavy responsibility that it bears in our criminal justice system. It is unquestionably essential to our society that our laws be enforced swiftly and surely. This court also believes, however, that our society is not bettered by law enforcement that, although it may be swift and sure, is not conducted in a spirit of fairness or good faith. Those who break our laws must be brought to account for their wrongs, but it is imperative that they be brought to this accounting through an orderly procedure conducted in the spirit of justice. This court's first duty, then, is to insure that our laws are fairly enforced, or as Mr. Chief Justice Warren aptly put it: "[our duty] is to see that the waters of justice are not polluted." Mesarosh v. United States, *supra,* 352 U.S. at 14, 77 S.Ct. at 8.

Although it hurts me deeply, I am forced to the conclusion that the prosecution in this trial had something other than attaining justice foremost in its mind. In deciding this motion I have taken into consideration the prosecution's conduct throughout the entire trial. The fact that incidents of misconduct formed a pattern throughout the course of the trial leads me to the belief that this case was not prosecuted in good faith or in the spirit of justice. The waters of justice have been polluted, and dismissal, I believe, is the appropriate cure for the pollution in this case.