**UNITED STATES of America,
Plaintiff,**

v.

**Frank DeMARCO, Jr., Defendant.**

**No. CR 75–1129–F.**

United States District Court,
C.D. California.

Nov. 10, 1975.

Jay Horowitz, Asst. Special Prosecutor, Watergate Special Prosecution Force, Los Angeles, Cal., for plaintiff.

Charles A. McNelis, Welch & Morgan, Washington, D.C., Donald C. Smaltz, Los Angeles, Cal., for defendant.

## MEMORANDUM OPINION

FERGUSON, District Judge.

In the years 1970, 1971, and 1972, former President Richard M. Nixon claimed tax deductions based on an alleged 1969 charitable contribution to the United States of pre-Presidential papers worth $576,000. Questions as to the validity of those deductions sparked investigations by, or authorized by, a number of governmental bodies including the Internal Revenue Service, the Joint Committee on Internal Revenue Taxation of the Congress of the United States, and the Watergate Special Prosecution Force.

One result of those investigations was the indictment in this case of Frank DeMarco, Jr., an attorney who handled Mr. Nixon's tax affairs. The gravamen of the indictment was that DeMarco conspired to and did make false statements on a number of occasions to investigating governmental agencies about the material facts surrounding the alleged 1969 gift of papers.

Thus this is no ordinary criminal matter. The public interest in a resolution of the issues raised by the government's indictment is manifest. But the public has a greater interest in the proper administration of our system of criminal justice. The defendant Frank DeMarco, Jr. has moved to dismiss charges against him on the ground of prosecutorial misconduct, and the motion must be granted.

*Background*

(1) On February 19, 1975 an indictment was filed charging Frank DeMarco, Jr. with violations of 18 U.S.C. §§ 371, 1001, and 1505.

(2) On July 28, 1975 an additional indictment was filed charging DeMarco with another violation of 18 U.S.C. § 1001.

(3) Subsequently, the government moved to dismiss the 18 U.S.C. § 371 charge, and the court granted the motion.

(4) After disclosures of prosecutorial misconduct involving improper threats calculated to deter the defendant from exercising his statutory venue rights, it became necessary to dismiss the second 18 U.S.C. § 1001 charge.[1]

(5) The case proceeded to trial on the first 18 U.S.C. § 1001 charge and the 18 U.S.C. § 1505 charge. As the trial developed, it became increasingly clear that a crucial issue was whether or not the prosecution could prove that DeMarco possessed the criminal intent necessary for a conviction, i. e., did the defendant intentionally make false statements to Internal Revenue agents and did the defendant corruptly and intentionally obstruct the due and proper exercise of the power of inquiry of the Joint Committee on Internal Revenue Taxation of the Congress of the United States by submitting documents which he knew to be false.

(6) To support its burden on the issue of scienter, the government called Anthony J. Passaretti, a former Internal Revenue agent, who during the time period relevant to his trial testimony was specially assigned to the Watergate Spe-

---

1. The facts and reasoning underlying the dismissal are more fully explained in *United States v. DeMarco*, 401 F.Supp. 505 (D.C.Cal. 1975).

cial Prosecution Force. Passaretti testified to admissions allegedly made by DeMarco on August 3, 1974.

(7) The meeting at which these admissions were purportedly made was attended by Jay Horowitz, the lead government prosecutor in this case; Henry L. Hecht, an Assistant Special Prosecutor, who sat at the counsel table assisting the government throughout this trial; the defendant Frank DeMarco; his attorney, Charles McNelis; and the witness, Anthony Passaretti.

(8) Both sides agree that during the course of that meeting Horowitz lost his temper, raised his voice, yelled at the defendant, and finally suggested that McNelis and DeMarco leave the room to confer. After a conference of approximately twenty minutes, McNelis returned to the meeting room without DeMarco and allegedly made an admission of DeMarco's criminal scienter. Later DeMarco returned and allegedly made a similar admission.

(9) The prosecution had reason to believe that the defense would maintain DeMarco did not admit that he had intentionally made false statements. Rather the defense would contend that DeMarco's statements had been false but not knowingly false. Moreover, it was apparent that the defense would contend that any incriminatory statements attributed to DeMarco with respect to his intent were taken out of context from a setting in which even the prosecution understood he should be excused.

(10) The conclusion of Passaretti's testimony struck a death blow to the expected defense. Passaretti testified that after DeMarco and McNelis had consulted for twenty minutes, and after McNelis returned to the room, DeMarco came back into the room and affirmed his criminal intent:

"Q. Then did there come a time after that when Mr. DeMarco returned to the room?

A. Yes, he did.

Q. Can you tell us what, if anything, was said at that time?

A. Mr. Horowitz asked him again, 'Did you wilfully and knowingly tell these lies.'

And Mr. DeMarco said, 'Yes, I did.'

Q. Did Mr. DeMarco make any comments as he was leaving that day?

A. It is my recollection that I was standing near Mr. DeMarco at the door as they were getting ready to leave for the day.

And Mr. DeMarco said to me, 'I'm glad it's out. I feel better that it is out.'

MISS NIEMAN: I have no further questions, your Honor."

(11) In the discovery order entered on August 25, 1975 and consented to by Horowitz on behalf of the government, the government represented that the government already had furnished to defense counsel "all typewritten or handwritten memoranda or notes in its possession which reflect DeMarco's statements to . . . representatives of the Watergate Special Prosecution Force. . . ." Moreover, the government further represented that it was "furnishing counsel for the defendant DeMarco with access to and/or copies of material arguably required to be furnished under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)."

(12) Those representations were not true. The government did not hand over material reflecting DeMarco's statements which clearly constituted exculpatory material under *Brady.*

(a) *Horowitz memorandum.*

▮ Sometime between August 5, 1974 and August 8, 1974, Horowitz prepared a memorandum for his acting superior, James Vorenberg, which was designed to set "forth the considerations relevant to the [government's] offering Frank DeMarco a plea to a felony charge as a disposition of all charges against him." The memorandum is of special significance because it was prepared within a short time after DeMarco's alleged admissions. In addition, it was reviewed by Hecht, who had also

attended the August third meeting, and Hecht contributed to the document by adding handwritten suggested changes to it. Thus the document was not a mere internal governmental memorandum. It reflected the conclusions of two material witnesses to the August third meeting.[2] The document indicates that an incriminating admission had been made by McNelis, not by DeMarco, and that the incriminating admission referred to the alleged false statements made in Los Angeles in March, 1974 (the 18 U.S.C. § 1001 charge which was dismissed by this court because of other prosecutorial misconduct), not to the charges contained in the July 28, 1975 indictment.

The memorandum states that:

DeMarco recently, and for the first time, has admitted that he is guilty of a crime relating to this matter. Specifically, on Saturday, August 3, 1974, *through his attorney*, DeMarco admitted having wilfully and deliberately lied to the IRS agents who questioned him under oath[3] in March 1974. (emphasis added).

Moreover the memorandum, insofar as it refers to statements of DeMarco, states that he continued to deny his criminal intent. For example, the memorandum states that, "Insofar as trial considerations are concerned, DeMarco's availability as a witness would be very helpful in simplifying the case. This is so even if DeMarco continues to maintain his personal innocence of any underlying fraud. . . ." At another point the memorandum recites that:

"[D]eMarco's current version of the 1969 and 1970 facts, at best, does not support and, at worst, weakens the charges of underlying fraud, particularly, in view of DeMarco's current statements that he was responsible for composing the back-dated deed and yet, in so doing, *was not acting wilfully himself.* . . ." (emphasis added).

Finally, in the concluding paragraph, the memorandum refers again to DeMarco's "protestations of innocence." "The possible difficulties arising from DeMarco's protestations of innocence and equivocation as to the underlying fraud, seems considerably outweighed by the advantages in maintaining momentum. . . ."

It does not require a fertile imagination to recognize that this document could be used by the defense to cast doubt on the proposition that DeMarco personally admitted on August third that he was guilty of wilfully and knowingly making false statements.

Yet the government did not disclose the existence of this document pursuant to the discovery order even though it was relevant evidence as to what DeMarco had said to representatives of the Watergate Special Prosecution Force on August 3, 1974. Indeed had the memorandum not been perceived by the government to be beneficial to its position on another defense motion, this court and the defense would still be unaware of its existence.

The defense moved to suppress DeMarco's alleged admissions on the ground that any admissions made were in connection with plea negotiations. *Fed.R.Ev.* 410. In a hearing on the motion conducted in chambers on October 7, 1975, Horowitz testified that he knew that plea negotiations could not have commenced on August 3, 1974 because he had not even composed a memorandum to his superiors suggesting a disposition until at least August 5, 1974. The defense apprised, for the first time, of the existence of a memorandum, asked

---

**2.** The fact that government memoranda are not discoverable under Rule 16(b) of the *Federal Rules of Criminal Procedure* cannot qualify the government's responsibilities under *Brady*. The very purpose of *Brady* was to make clear that the due process clause compels the

production of material not otherwise discoverable.

**3.** The words "under oath" were handwritten suggestions of Hecht.

to examine it. Then and only then did the prosecution provide the defense with the knowledge that two witnesses to the alleged admissions had composed a document which could be used to support the proposition that DeMarco had not made the alleged statements.

To be sure, Horowitz has an "explanation" of the memorandum. It is that DeMarco on August fifth shifted his story and reasserted his innocence.[4] But if DeMarco had unequivocally admitted guilt in front of these potential government witnesses on August third, one might expect that Horowitz' superiors would be interested. Surely they would be more interested in the admissible admissions of a defendant, than in the inadmissible admissions of a defendant's attorney.

■ But the question is not whether or not Horowitz believes he can satisfactorily explain the document. The question is whether or not the document could have been used by the defense to convince individuals that no admissions had been made by DeMarco. That is a question for judge and jury. By suppressing this evidence, Horowitz attempted to become the trier of fact. That is not the prosecutor's function. His duty is to provide exculpatory evidence to the defense and then seek to rebut it before the trier of fact. It is not the prosecutor's function to structure a proceeding in such a way that exculpatory material is concealed from the defense, the court, and the jury. As the District of Columbia Court of Appeals stated in *Griffin v. United States*, 87 U.S.App.D.C. 172, 183 F.2d 990, 993 (1950), "[This] case emphasizes the necessity of disclosure by the prosecution of evidence that may reasonably be considered . . . useful to the defense." See also *Barber v. Warden, Md. Penitentiary*, 331 F.2d 842, 845 (5th Cir. 1964).

(b) *Hecht notes.*

Pursuant to the discovery order, the government did hand over to the defense a "typed transcription of Hecht's notes" of the August third meeting. The transcription does not contain any reference to admissions of DeMarco. The government did not hand over the original notes themselves. Contained in the original notes, but not in the typed transcription, was the following: "McNelis *alone.* Knew *prev.* deed *story* in error as To deed chron Wilful & knowingly to IRS agents told false story." (emphasis in original).

Horowitz indicated that Hecht's notes did not contain a reference to the DeMarco admissions because they were abbreviated notes, merely jottings taken during the meeting. But the fact that admissions of McNelis were recorded was damaging evidence to the government's case. It strains credulity to suppose that a government prosecutor would record the inadmissible statements of an attorney but would fail to record the admissible statements of scienter from the lips of a target defendant. The Hecht notes also corroborate the defense reading of the Horowitz memorandum; McNelis may have made an admission of scienter; DeMarco did not.[5]

Thus Hecht's notes of the meeting (DeMarco's *and* McNelis' statements), however abbreviated, taken together with the Horowitz memorandum, strongly support the conclusion that any admissions made by DeMarco were equivocal

---

**4.** This explanation, on its face, presents difficulties. Horowitz refers to August third admissions of McNelis, but does not refer to DeMarco's statements. Surely if DeMarco changed his story on August 5th, the government did not expect that McNelis would continue to assert DeMarco's guilt (assuming he ever did).

**5.** Moreover the Hecht notes militate against Horowitz' explanation of the Horowitz memorandum. Horowitz maintained that his present recollection is that he did not include DeMarco's admissions of August third because DeMarco "backed off" the statements on August fifth. But the Hecht notes taken on August third do not include the admission, and Hecht could not then have known that DeMarco would "back off" the statements.

and not even worth writing down, that the only unequivocal, unvarnished recognition of criminal scienter was provided by McNelis, and that was worth writing down, not once but twice.

Yet, despite the discovery order, the Hecht notes of the August third meeting were edited to exclude the recording of the statements alleged to have been made by McNelis after he returned to the room without DeMarco. Defense counsel did not receive the McNelis entries[6] until the defense made a motion to receive the original notes of that and a series of other meetings during the cross-examination of Passaretti. Clearly the notes were exculpatory and should have been given to the defense pursuant to the discovery order.

(13) Finally, not until after Passaretti's direct testimony did the government disclose to the defense or to this court that it was aware of at least one witness to the August third meeting who did not remember DeMarco making any admissions after he left the room with McNelis. Horowitz, himself, stated in a hearing conducted outside the presence of the jury:

> "Now, Mr. Passaretti, I know—because we have spoken with him about this, and so forth—believes that at that point [after DeMarco returned to the meeting room] Mr. DeMarco repeated what had been his early muted admission, which had prompted me to send him out of the room. And that is Mr. Passaretti's best belief, and I have no doubt that he remembers it if he so testifies. I know, for a fact, that Mr. DeMarco initially, *before* I sent him out of the room, said that. . . ." (emphasis added).

But Horowitz stated that to his recollection there had been only "one affirmative answer," *i. e.*, the muted answer to the question before DeMarco left the

room. This was a startling admission because it meant that the lead government prosecutor's rendition of the events was different from Passaretti's. The admission was yet another confirmation of the implications of the documentation that at the time of the August third meeting, DeMarco had not made unequivocal admissions. It was an additional indication that Passaretti's recollection was erroneous.

### Rule 403

 Rule 403 of the *Federal Rules of Evidence* provides that, "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ."

If the government had adhered to its duties under the discovery order and under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the defense could have moved to exclude the most damaging aspects of Passaretti's testimony under Rule 403, and the motion would have been granted. The probative value of Passaretti's testimony is slight in comparison to its capacity for unfair prejudice and confusion of the issues.

### Probative Value

 This court believes that Passaretti honestly attempted to relate to the court and jury his best recollection of the events of August 3, 1974. But this court finds that no admissions were made by DeMarco after he returned to the room following his conference with McNelis. If such statements had been made, Horowitz and Hecht would have remembered them and would have recorded them in their notes and memoranda.

---

**6.** The transcript reveals that Horowitz mentioned the McNelis entry during the October sixth hearing. But that parenthetical aside did not serve as a substitute for complying with the order. This court cannot fault defense counsel for failing to immediately appreciate the full significance of this oral aside. Defense counsel did promptly bring this matter to the attention of the court when it finally saw the notes.

The record of this trial reveals a prosecutorial attention to detail that is unsurpassed. The government attempted to draw subtle nuances from scores of exhibits introduced in evidence.[7] It is inconceivable that prosecutors, who seemed to catch every available inference from seemingly irrelevant material, would miss or forget the most damaging evidence they could ever hope to unearth, an admission of criminal scienter from the mouth of the defendant.

As to the admissions alleged to have been made by DeMarco before he left the room, it is clear that they are of dubious probative value. As Passaretti testified (out of the presence of the jury) the alleged admissions by DeMarco prior to leaving the room were so equivocal as to be useless.[8]

"He said that he wilfully and knowingly lied in answer to several of [Horowitz'] questions, but in almost every case, he immediately attached some explanation to it which went to making the answers a nullity. . . . *We became annoyed with his answers because they took away the answers itself.*" (emphasis added).

### Unfair Prejudice and Confusion of Issues

The major prejudicial danger involved in introducing Passaretti's testimony is that the most plausible interpretation of the evidence could not be presented to the jury without unduly prejudicing the defense. The most plausible interpretation of the evidence is that McNelis, not DeMarco, made admissions as to scienter. But as counsel for DeMarco argued:

"[I]t would have been—we would have just been doing—just damning ourselves if we had attempted to have Passaretti admit that the admissions, or confessions of DeMarco were not made by the defendant DeMarco, but by his lawyer, Mr. McNelis.

I mean, we just couldn't go that way. If the jury believed that McNelis believed his client was guilty, it would take them about two minutes, probably, to vote for a decision of conviction in this case."

In short, the defense could not develop the fact that Passaretti's testimony was of dubious value without prejudicing their case. The jury, then, could not be in a position to fairly evaluate the events of August third.

It, of course, is "generally held that an attorney, merely by reason of his employment in connection with litigation, pending or prospective, has no power to affect his client by admissions of fact made out of court. . . ." 7 *Am. Jur.2d, Attorneys at Law,* § 122, at 121 (1963). The government, therefore, did not attempt to offer McNelis' statements on direct examination. The introduction of Passaretti's testimony presented defense counsel with testimony that if appropriately attacked could only weaken their position. The danger of unfair prejudice in this situation is obvious.

Moreover there is an additional potential for prejudice and confusion of serious magnitude. Any attempt to impeach Passaretti's testimony would involve calling three attorneys in this case to the witness stand: Horowitz, Hecht, and McNelis. That development would have turned this trial into a three ring circus. Final arguments would have called upon the lawyers in this case to argue their own credibility and to attack the credibility of opposing counsel.

Nothing could be more likely to distract the jury from a focus on the evidence accumulated in this case. As

---

7. More than two hundred and fifty exhibits were marked for identification.

8. The prosecution on direct examination deliberately left a wholly different impression—that DeMarco had made a series of uninhibited unequivocal admissions. As the Fourth Circuit stated in *Hamric v. Bailey,* 386 F.2d 390, 394 (1967), "Evidence may be false either because it is perjured, or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true. . . . [D]ue process is violated not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact."

presented, the case called upon the jury to make an intelligent analysis of a complicated documentary case. To distract members of the jury from that evidence to an emphasis upon attorney personalities would not serve the interests of justice.

The failure of the government to disclose exculpatory evidence in a timely fashion prevented this court from making a considered decision as to the admissibility of Passaretti's testimony. It is necessary, therefore, to formulate an appropriate sanction.

Rule 16(d), although not precisely in point (see note 2), does provide guidance. It states that if

> "at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, *or it may enter such other order as it deems just under the circumstances."* (emphasis added).

Moreover, as Chief Judge Nichol recently stated in *United States v. Banks,* 383 F.Supp. 389, 392 (D.S.D.1974):

> "It is this court's feeling that when the prosecutor acts in bad faith in complying with the orders and inquiries of the court the administration of justice is tainted and the court should, or at least has a right to, formulate a remedy through use of its supervisory powers. . . .
>
> The remedy should be directly related to the seriousness of the misconduct, *i. e.,* serious misconduct warrants a more drastic remedy than does minor misconduct. . . . I feel that the interests of justice are best served by dismissal."

The prosecutorial misconduct surrounding this trial has indeed been serious. It follows on the heels of earlier mis-

conduct which required the dismissal of another indictment of this defendant. The declaration of a mistrial in aggravated circumstances such as these would not be an appropriate remedy. Prosecutors must learn to recognize that if they deliberately withhold vital exculpatory material they risk dismissal of charges. Our "fastidious regard for the honor of the administration of justice" (*Communist Party of the United States v. Subversive Activities Control Board,* 351 U.S. 115, 124, 76 S.Ct. 663, 668, 100 L.Ed. 1003 (1956); *Mesarosh v. United States,* 352 U.S. 1, 14, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956); *United States v. Basurto,* 497 F.2d 781, 786–87 (9th Cir. 1974); *United States v. DeMarco, supra,* 401 F.Supp. at 514) requires nothing less.

It is therefore ordered that the motion to dismiss is granted, that the action is dismissed in accordance with Rule 32(b) of the *Federal Rules of Criminal Procedure,* "If the defendant is found not guilty or for *any other reason* is entitled to be discharged, judgment shall be entered accordingly." (emphasis added).